ORIGINAL

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

PAUL SHIMEK, III, KATHY
FORBES, GEORGE FORBES,
MILDRED BOBBITT, and
JOHN ROSA,

       **Plaintiffs,**

v.

WEISSMAN, NOWACK, CURRY
& WILCO, P.C.,

       **Defendant.**

**CIVIL ACTION
FILE NO. 1:02 CV 3020 WBH**

### DEFENDANT WEISSMAN, NOWACK, CURRY & WILCO, P.C.'S RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

### I.    INTRODUCTION

Plaintiffs brought the instant action alleging various violations of the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 *et seq.* (hereinafter "FDCPA"), occurred when Plaintiffs received a letter informing them that a lien had been filed against their properties to secure unpaid assessments to their respective homeowners associations and by filing such liens prior to providing Plaintiffs with the opportunity to dispute the debt upon which the liens were filed.  Defendant Weissman, Nowack, Curry & Wilco, P.C. (hereinafter "WNCW") denies that it has violated the FDCPA and respectfully requests that this Court deny Plaintiffs'

12

motion for summary judgment.

## II.   FACTUAL BACKGROUND

WNCW is a law firm that, among other things, represents Georgia community associations.[1] SMF, ¶ 1. Plaintiffs are owners of property within two subdivisions for which WNCW represents the corresponding homeowners associations. Id., ¶ 2. WNCW sent the following notice letter to all Plaintiffs:

> **This firm represents [Homeowners Association].   Our client's records show that you are the owner of property at [Subdivision]. If this information is not correct, please notify us.**
>
> **Our client's records indicate that, as of the date of this letter, you owe a total of [Amount Past Due] in past due assessments and charges to [Homeowners Association]. This firm has been engaged to collect this debt. This letter is to notify you that, pursuant to the governing documents for [Homeowners Association], a lien has been sent to the Clerk of Court to secure this sum.**
>
> **You have thirty (30) days after you receive this letter to**

---

[1] WNCW will reference its Statement of Material Facts Not in Dispute by Paragraph as follows: "SMF ¶ _."

dispute the validity of the debt or any part of it.  If you do not dispute the above-referenced debt within that period, we can assume the debt is valid.  If you dispute it, by notifying us in writing to that effect, we will, as required by law, obtain and mail verification of the debt to you.

If you want to resolve this matter, you must, no later than thirty (30) days after your receipt of this letter, either pay [Amount Past Due] or notify us that you dispute the debt. Although we have requested that you pay [Amount Past Due] within thirty (30) days following your receipt of this letter, our request does not eliminate your right to dispute this debt within the same thirty (30) day period (i.e. within thirty (30) days of receipt of this letter).  If you dispute this debt by notifying us in writing, we will cease any efforts to collect the debt until we have mailed verification of this debt to you.

All payments must be made by cashier's check or money order, payable to the Association and sent to this office.  If you have any questions, please contact our collection department for assistance.  This letter is an attempt to collect a debt, and any

3

**information obtained will be used for that purpose.**

Id., ¶ 3. (hereinafter "the Letter").

Simultaneously with the mailing of this letter, WNCW mailed a lien to secure the proper amount with the Clerk of the Superior Court of Cobb County Georgia. Id., ¶ 4. As will be shown below, WNCW has not violated any portion of the FDCPA as alleged by Plaintiffs. Accordingly, this Court should deny Plaintiffs' motion for summary judgment.

## II. ARGUMENT

While Plaintiffs allege four violations of the FDCPA, Plaintiffs' claims are essentially that WNCW violated the FDCPA by filing a lien and sending them the Letter quoted above. However, nothing in the FDCPA precludes WNCW from filing such a lien or sending the Letter. In fact, the language in the Letter matches the language suggested by the United States Court of Appeals for the Seventh Circuit to be in compliance with the FDCPA as stated in the case of Bartlett v. Heibl, 128 F.3d 497, 500-02 (7th Cir. 1997). A review of the Letter and the relevant authority clearly shows the instant case fails to state any claim upon which relief can be granted and therefore, Plaintiffs' motion for summary judgment should be denied and WNCW's motion to dismiss should be granted.

Additionally, Plaintiffs failed to support their motion for summary judgment

with affidavits or other admissible evidence to support their assertions.   Such

failure to submit affidavits or other admissible evidence in support of their motion

for summary judgment mandates a denial of their Motion.

A.    *Plaintiffs' Motion For Summary Judgment Should Be Denied Because It Is Unsupported By Any Admissible Evidence.*

Rule 56(e) of the Federal Rules of Civil Procedure provides:

Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. **Sworn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith.**

(Emphasis added.)

Local Rule 7.1 provides:

Every motion presented to the clerk for filing shall be accompanied by a memorandum of law which cites supporting authority. **If allegations of fact are relied upon, supporting affidavits must be attached to the memorandum of law.**

(Emphasis added.)

"To be admissible at the summary judgment stage, 'documents must be

authenticated by and attached to an affidavit that meets the requirements of Rule

56(e).'" Orsi v. Kirkwood, 999 F.2d 86, 92 (4th Cir. 1993)(*citing* 10A Charles A.

Wright et al., Federal Practice and Procedure § 2722, at 58-60 (1983 & 1993

Supp.).) It is well established that unsworn, unauthenticated documents cannot be considered on a motion for summary judgment. Hal Roach Studios, Inc. v. Richard Feiner and Co., 896 F.2d 1542, 1550-51 (9th Cir. 1990); Martz v. Union Labor Life Ins. Co., 757 F.2d 135, 138 (7th Cir. 1985). In the instant matter, Plaintiffs have failed to offer a single affidavit to support their motion. Accordingly, as a matter of law, Plaintiffs motion for summary must be denied, as they have failed to offer any admissible proof in support of their claims.

However, out of an abundance of caution, WNCW will respond to Plaintiffs' contentions. Even accepting Plaintiffs' facts as if they had been properly substantiated, their claims still fail.

**B.** ***Plaintiffs' Motion For Summary Judgment Should Be Denied Because Nothing In The FDCPA Mandates That A Debt Collector Provide Unnecessary, False And Misleading Information.***

Plaintiffs allege that they are entitled to summary judgment because WNCW failed to offer them that which did not exist. Specifically, Plaintiffs claim that by failing to offer to provide them with a judgment that never existed and by failing to offer to provide them with the name of a non-existent original creditor, WNCW violated the FDCPA. These claims are prime examples of the hyper-technical nature of the alleged violations in this suit.

6

*1.  WNCW Had No Obligation To Offer To Produce A Judgment That
        Never Existed.*

Plaintiffs claim that WNCW's Letter violated 15 U.S.C. § 1692g(a)(4) because it did not inform Plaintiffs that if they disputed the debt, WNCW would obtain a copy of the judgment against them and mail it to them. 15 U.S.C. § 1692g(a)(4) requires a debt collector to inform the debtor that upon written request the debt collector will "obtain verification of the debt or a copy of the judgment against the consumer . . . ." However, in the instant case, *no such judgment existed* and the amounts WNCW was seeking to collect had not been reduced to judgment. SMF, ¶ 5. Plaintiffs do not contend that collection of a judgment was the basis for WNCW's Letter.  Consequently, Plaintiffs allege that WNCW should have provided to them notice of that which did not exist (i.e. a judgment).

In support of their claim that WNCW was required to offer to produce a non-existent judgment, Plaintiffs cite to Baker v. G. C. Services Corp., 677 F.2d 775, 778 (9th Cir. 1982), Prevete v. Margolin & Meltzer, 1998 WL 426700, *2, Civil Action No. No. 95 CV 5153 (E.D.N.Y. May 19, 1998) and Altergott v. Modern Collection Techniques, Inc., 1994 WL 319229, *2, Civil Action No. 93 C 4312 (N.D. Ill. June 23, 1994).  However, these cases have no application to the issues before this Court.

In Baker the Ninth Circuit stated that "the only statement referring to a dispute regarding the validity of the debt, as required by 15 U.S.C. s 1692g(a)(3), is the sentence '[o]therwise the debt will be assumed to be valid.'" The Baker court went on to hold that this sentence was "simply not sufficient to put a debtor on notice that he could dispute a portion of the debt" and thus violated the FDCPA. Id. Plaintiffs fail to offer an explanation of how this holding applies in the instant case. Baker dealt with a failure to put a debtor on notice as to his right to dispute the debt, a right which he clearly had, as well as, a right of which all debtors must be notified. The instant matter addresses the alleged obligation of WNCW to offer to produce a non-existent judgment. Seeking to work any meaningful analogy between Baker and the instant matter is not possible.

Likewise, the other authority offered by Plaintiffs is inapplicable to the issue. In Prevete v. Margolin & Meltzer, 1998 WL 426700, *2, Civil Action No. No. 95 CV 5153 (E.D.N.Y. May 19, 1998)(Unpublished), that court held that the following language in its demand letter was in violation of section 1692g(a)(4) because it did not include a statement advising the debtor of her right to obtain verification of the debt.:

> If you notify us in writing of your dispute within this 30-day period
> we will provide you with the name and address of the original creditor
> if different from the current creditor

8

Prevete went on to hold that:

> Section 1692g(a)(4) provides that if a consumer notifies the debt
> collector in writing within the thirty-day period, "the debt collector
> will obtain verification of the debt ... and a copy of the verification
> will be mailed to the consumer." 15 U.S.C. § 1692g(a)(4). **Defendant
> was required to inform plaintiff of her right to obtain such a
> verification of the debt. A debt collector violates Section 1692g if it
> does not provide the information required under the Act.**

Id. (emphasis added).

Therefore, Prevete dealt with a debt collector who failed to inform a debtor of her

right to receive verification of the debt as specified by 15 U.S.C. § 1692g(a)(4).

There is no question that WNCW provided the proper notice to Plaintiffs regarding

verification. SMF, ¶ 6. Therefore, Prevete is inapplicable.

Altergott v. Modern Collection Techniques, Inc., 1994 WL 319229, *2,

Civil Action No. 93 C 4312 (N.D. Ill. June 23, 1994)(Unpublished), also offers this

Court no useful guidance with regard to Plaintiffs' claim that the failure of WNCW

to offer a copy of a non-existent judgment somehow violated 15 U.S.C. §

1692g(a)(4).  Altergott fails to discuss the specific omissions that it found to be in

violation of the FDCPA.  Consequently, it is impossible to discern on what basis

that court found fault with language employed by that particular debt collector.

Plaintiffs claim that, although no judgment existed, WNCW should have

9

quoted the language of § 1692g(a)(4) verbatim.  Plaintiffs offer the following series of cases for the proposition that it is never misleading to quote verbatim, the notice language from the FDCPA.  <u>Jang v. A.M. Miller and Associates</u>, 122 F.3d 480 (7th Cir. 1997); <u>Shorty v. Capital One Bank</u>, 90 F.Supp.2d 1330 (D.N.M. 2000); <u>Moore v. Ingram & Assoc.</u>, Inc., 805 F. Supp. 2d. 7, 8-9 (D.S.C. 1992) and <u>Blackwell v. Professional Business Services of Georgia, Inc.</u>, 526 F. Supp. 535, 538-39 (N.D. Ga. 1981). WNCW readily concedes that all of these cases hold that a debt collector cannot be found to be in violation of the FDCPA by reproducing the notice language of the statute verbatim.  However, this is of no consequence to the issue of whether WNCW was *required* to recapitulate verbatim, the notice language of the statute.

"[T]here simply is no requirement that the letter quote verbatim the language of the statute." <u>Emanuel v. American Credit Exch.</u>, 870 F.2d 805, 808 (2d Cir. 1989). Plaintiffs concede that WNCW informed Plaintiffs that if they disputed the debt in writing, WNCW would obtain verification of the debt. SMF, ¶ 6.  The disjunctive term "or" is used by the FDCPA to denote that one or the other will be provided.  Accordingly, a debt collector need only offer to produce verification of the debt or a copy of the judgment, depending on the applicable circumstance. <u>Beeman v. Lacy, Katzen, Ryen & Mittleman</u>, 892 F. Supp. 405, 410 (N.D.N.Y.

1995)

While the FDCPA does contain the language Plaintiffs assert, the FDCPA, when read as a whole, does not mandate that debt collectors make false and/or misleading statements to debtors in an exercise of hyper-technical statutory compliance.  Emanuel, 870 F.2d at 808.

> Requiring the debt collector to inform the consumer that it will obtain and send a copy of a non-existent judgment serves no similar salutary purpose. If the debt collector is aware that there is no judgment, both clarity and the strict language of the statute suggest that it should not confuse the consumer by directly or indirectly implying that a judgment exists.

Beeman, 892 F. Supp. at 410.  Such holdings make complete sense.  No useful purpose is served by mandating that a debt collector inform a debtor that a non-existent judgment will be provided on demand. Stojanovski v. Strobl and Manoogian, P.C., 783 F. Supp. 319, 324 (E.D. Mich. 1992).  Consequently, Plaintiffs' claims under 15 U.S.C. § 1692g(a)(4) should be denied.

> 2.    *WNCW Had No Obligation To Offer To Produce The Name Of A Non-existent "Original Creditor"*

Plaintiffs also claim that WNCW violated the FDCPA because it failed to offer to provide the name and the address of Plaintiffs' original creditor.  15 U.S.C. § 1692g(a)(5) requires a debt collector to state that "upon the consumer's written request within the thirty-day period, the debt collector will provide the consumer

11

with the name and address of the original creditor, **if different from the current creditor**." (Emphasis added.) However, in the instant case, WNCW was representing the *original* creditors of Plaintiffs. SMF, ¶ 7. Therefore, the current creditors were the original creditors.

Moreover, the Letter clearly and unambiguously states that WNCW was retained by the respective Plaintiffs' homeowners associations to collect unpaid homeowners association assessments from them. It is self-evident from the Letter that Plaintiffs' respective homeowners associations are the original creditors. Plaintiffs do not allege the existence of an original creditor different from the creditors WNCW communicated to Plaintiffs it represented. Plaintiffs once again allege that WNCW violated the FDCPA by failing to offer to provide them that which does not exist.

The sole case Plaintiffs offer to support their claim under 15 U.S.C. § 1692g(a)(5) is Cavallaro v. Law Office of Shapiro & Kreisman, 933 F. Supp. 1148 (E.D.N.Y. 1996). However, Cavallaro does not even address the issue before the Court. In Cavallaro, the debt collector sent a demand letter and a separate page with a validation notice on it in the same envelope. The demand letter did not contain the name and address of the original creditor, but the validation page did. The Court held that the debtor's claim that the debt collector failed to disclosure

12

the name and address of the original creditor was simply factually incorrect. Id. at 1154. The Court did not even address the issue of whether the name and address of an original creditor need be stated if, in fact, the creditor on whose behalf the letter is sent is the original creditor. In direct contravention of Plaintiffs' argument, 15 U.S.C. § 1692g(a)(5) unambiguously requires that WNCW provide the address of the original creditor, if the original creditor is different from the one currently pursuing the debt. Stojanovski, 783 F. Supp. at 324.

"There is no indication that [the homeowners association] was not the original creditor . . . As [the homeowners association] is the original creditor, there is no reason for [WNCW] to insert language comporting with the last clause of section 1692g(a)(5)." Stojanovski, 783 F. Supp. at 324. The FDCPA does not require a debt collector to provide a debtor with misleading information. Beeman, 892 F. Supp. at 410. In fact, providing a debtor with misleading information is itself a violation of the FDCPA. See 15 U.S.C. § 1692g(a) & 1692e. Accordingly, because there is no dispute whatsoever that the homeowners associations WNCW was representing are the original creditors of Plaintiffs, there is no requirement that WNCW's Letter should have offered to provide information on a different, non-existent original creditor. Therefore, Plaintiffs' claims under 15 U.S.C. § 1692g(a)(5) should be denied.

13

**C.**  ***Plaintiffs' Motion For Summary Judgment Should Be Denied Because Filing A Lien Contemporaneously With Sending A Notice Letter To A Debtor Is Not A Violation Of The FDCPA.***

Plaintiffs claim that by forwarding liens to the Clerk of Court for filing, contemporaneously with sending a notice letter to Plaintiffs, WNCW violated 15 U.S.C. § 1692g(b) of the FDCPA.  According to Plaintiffs, it was a violation for WNCW to **file** liens to secure unpaid assessments prior to Plaintiffs' opportunity to dispute the debt.

### *1. The Filing of Liens With the Clerk of Court is Not a Violation of the FDCPA.*

The ***only*** legal authority offered by Plaintiffs to support their position on the issue is a single state trial court opinion. See Loigman v. Kings Landing Condominium Association, Inc., 324 N.J. Super. 97, 734 A.2d 367 (1999).  However, as WNCW will show this Court, the decision on which Plaintiffs rely is easily distinguished from the instant case and the legal reasoning in that opinion actually supports WNCW's actions in this matter.

In Loigman, Judge Fisher of the Chancery Division of the Superior Court of Monmouth County, New Jersey, issued his ruling based on the following facts:

1. A creditor stated in its initial communication to the debtor that it "might" file a lawsuit or file a lien on behalf of a condominium association.

2.    The creditor filed the lien well after sending the notice letter.

3.    The creditor filed the lien with the Court Clerk after the debtor had requested verification of the debt and before the debt was verified.

Loigman, 734 A.2d at 370.

Loigman found a violation in that the debt collector in that matter sent a lien for filing after verification had been requested.  Id.  In the instant case, WNCW informed Plaintiffs in its initial communication that it had sent a lien to the Clerk of Court to secure the sum owed.  Additionally, WNCW sent the lien to the Clerk of Court contemporaneously with sending the demand letters to Plaintiffs and long before verification of the debt was requested by Plaintiffs. SMF, ¶ 8.  Finally, WNCW took no action to foreclose on those liens prior to providing verification of the debt to Plaintiffs.  Consequently, the facts of Loigman and the instant matter are clearly different.

Plaintiffs argue that because the liens were recorded by the Cobb County Superior Court Clerk during the verification period, WNCW violated the FDCPA by engaging in a collection action during a prohibited time period. Plaintiffs' claims are legally, as well as, factually deficient.  WNCW cannot **record** a lien. No private party can **record** a lien.  The laws of Georgia vest that authority solely within the purview of the Clerk of the Superior Court of the proper county.  Price

15

v. Fulton County Com'n, 170 Ga.App. 736, 737, 318 S.E.2d 153, 155 (1984)(*citing* OCGA § 15-6-61 *et seq.*)(holding that "among the clerk's numerous duties is the responsibility of keeping various docket books, and books for recording deeds, mortgages and other liens, and bills of sale . . .") All WNCW can do is **file** a lien by transmitting it to the Court Clerk. It is then incumbent upon the Clerk to **record** the lien on the real estate records. Id.; See also, Mobley v. Bent Tree Community, Inc., 240 Ga. App. 220, 523 S.E.2d 69 (1999) (finding that the date a party files a document with the Court can be very different from the date the Clerk actually gets around to recording it on the official docket book); O.C.G.A. § 42-2-2(a)&(b).

WNCW sent the applicable liens to the Court Clerk contemporaneously with sending the demand letters. SMF, ¶ 8. WNCW's letter merely informed Plaintiffs of the action WNCW actually took, i.e. it sent the lien to the Court Clerk to be filed, no more, no less. Plaintiffs are asserting, in clear contravention of Georgia law and without any legal authority in support, that WNCW has authority over and responsibility for the Clerk of the Superior Court of Cobb County actually recording the lien on the official docket book.

Actually, Loigman fatally undercuts several of Plaintiffs' arguments. For instance, Loigman found no violation of the FDCPA by the creditor mentioning the

filing of the lien within the notice to the debtor. <u>Loigman</u>, 734 A.2d at 372

(holding that "this court is satisfied that the Association's November 23, 1998 letter

meets the requirements of 15 U.S.C. § 1692a. . . .")

That court in <u>Loigman</u> also held that:

> It seems to this court a small thing for an association to provide a copy of the lien to the unit owner at or about the time it is sent to the clerk for recording. **If the association is acting inappropriately in connection with that filing, the unit owner will know and have an opportunity to seek its removal.** If the association is acting properly in filing the lien, and the unit owner wants to keep the unit free from such an encumbrance, then it will be satisfied and the primary goal of the association--to be paid--will have been met. And if the lien is proper and the unit owner fails to satisfy it, then the association retains what is urged here: the right to prevent transfer of the property until the lien is satisfied.

<u>Id.</u> at 371 (emphasis added).

<u>Loigman</u> not only approves of the mentioning of the filing of a lien with the

court in a notice letter to the debtor, but it actually seems to require it.

Furthermore, the passage above demonstrates that there is no requirement that a

lien be withdrawn during the verification period, but rather only that a lien not

actually be submitted to the court for filing during that period.

WNCW was unable to find any authority holding that a lien cannot be filed

within the initial thirty day period.  However, in <u>Sprouse v. City Credits Co.</u>, 126

F.Supp.2d 1083 (S.D. Ohio 2000), the Court addressed similar issues and rejected

17

the debtor's claims that the debt collector had violated the FDCPA by filing a lawsuit within the thirty day period after it initially contacted the debtor. Id. at 1087-98. "The debt collector is perfectly free to sue within thirty days; he just must cease his efforts at collection during the interval between being asked for verification of the debt and mailing the verification to the debtor." Bartlett, 128 F.3d at 501. Likewise, "[u]ntil such time as the debtor requests verification of the debt, the debt collector may continue its collection efforts." Rabideau v. Management Adjustment Bureau, 805 F. Supp. 1086, 1092 (W.D.N.Y. 1991) (citing Smith v. Financial Collection Agencies, 770 F. Supp. 232, 236 (D. Del. 1991)).

### 2. Equitable Liens Under Georgia Law

Pursuant to Georgia law, an equitable lien for the failure to pay homeowners association assessments arises automatically if so provided by the declaration of covenants governing the subject subdivision. Country Greens Village One Owner's Assoc. v Meyers, 158 Ga. App. 609, 281 SE.2d 346 (1981). The manner in which notice of this lien is provided to the world is by filing notice of it with the County Clerk.

Both of the homeowners associations at issue in the instant case have declarations of covenants that specifically provide that a lien arises in their favor in

18

the event an owner fails to pay assessments. SMF, ¶ 9. Therefore, equitable liens arose at the time each of the Plaintiffs failed to make the required payments. Country Greens Village One Owner's Assoc., 281 SE.2d at 346. WNCW's filing of these liens was simply formal recognition of that which had already occurred and all of this occurred before Plaintiffs requested verification of the debt. SMF, ¶ 8.

Moreover, prohibiting a homeowners association from filing a notice of its equitable lien until 30 days after it had informed a debtor that it was going to do so would unfairly prejudice the homeowners associations' ability to give notice of its lien rights to the rest of the world. The debtor could easily alienate the property during that 30-day period and thereby avoid paying unpaid assessments that the lien would have otherwise protected had it been filed contemporaneously with the notice. The intent of the FDCPA is "to eliminate abusive debt collection practices by debt collectors. . . " 15 U.S.C. § 1692(a), it is not to eliminate a parties' substantive right to utilize substantive legal remedies to secure and collect upon a debt owed to it.

While WNCW could find no authority requiring the dismissal of a previously filed lien upon a request for verification of the debt, in the case of a lawsuit, once the debtor requests verification, the suit need not be dismissed, but

19

rather the debt collector can no longer actively pursue the action until the verification is completed. Ditty v. CheckRite. Ltd., Inc., 973 F. Supp. 1320, 1328 (D. Utah 1997). In the instant case, once the notices of the equitable liens were filed with the Court Clerk, the subsequent step in collection action upon them would have been to file an action for judicial foreclosure of the liens. Just as in the case of a lawsuit, once the Plaintiffs requested verification, WNCW was not required to dismiss the liens; rather WNCW was merely prohibited from actively pursuing an action for foreclosure upon the lien until the verification was completed. See Id.

In the instant case, WNCW took no further action to foreclose upon the liens after they were filed. SMF, ¶ 10. Moreover, Plaintiffs do not allege that further action to foreclose upon the liens was taken by WNCW after verification was requested by Plaintiffs. Therefore, WNCW did not violate 15 U.S.C. § 1692g(b).

**D.  Plaintiffs' Motion For Summary Judgment Should Be Denied Because WNCW's Letters of November 18, 2002, Did Not Violate The FDCPA.**

Plaintiffs Mildred Bobbitt and John Rosa allege that WNCW violated 15 U.S.C. § 1692c(a) by communicating with them directly rather than contacting them through legal counsel after WNCW knew they were represented by legal counsel. Plaintiffs gratuitously cite to the Georgia Rules of Professional Conduct

20

in an attempt to add weight to their claims. However, whether WNCW is a law firm is not relevant. WNCW is a debt collector for purposes of the FDCPA and is required to comply with the federal statutory rules applicable to all debt collectors. Plaintiffs' needless citation to the Georgia Rules of Professional Conduct yet again underpins the weakness of their claims and their inability to offer relevant legal authority to support their assertions.

Plaintiffs Bobbitt and Rosa allege and WNCW does not dispute that on November 18, 2002, WNCW sent a letter regarding Plaintiffs Bobbitt's and Rosa's unpaid homeowners association assessments. Plaintiffs' Statement of Material Facts Not in Dispute ("Plaintiffs' Statement of Facts"), ¶ 11. Phillip L. Bobbitt is an attorney licensed to practice law in Georgia. SMF, ¶ 11. On June 24, 2002, Phillip Bobbitt wrote to WNCW on Plaintiffs Bobbitt and Rosa's behalf regarding their debt to WNCW's client. SMF, ¶ 12. Phillip Bobbitt's letter is unambiguously a letter of representation of Plaintiffs Bobbitt and Rosa. Id. Therefore, WNCW's sending the November 18, 2002 letter to attorney Bobbitt was in compliance with the FDCPA, not a violation as alleged.

Plaintiffs allege that WNCW should have communicated with Plaintiffs' counsel in the instant case, the Kaidens, not attorney Bobbitt. However, WNCW has not received any communication from the Kaidens indicating they also

represent Plaintiffs Bobbitt and Rosa with regard to the underlying debt alleged by WNCW's client or that any communication with Attorney Bobbitt was no longer proper. SMF, ¶ 13. Moreover, Plaintiffs do not allege that communication with attorney Bobbitt was improper. Therefore, Plaintiffs' allegation that failure of WNCW to communicate with the Kaidens was a violation of the FDCPA is without merit. Consequently, Plaintiffs Bobbitt and Rosa cannot carry their burden to demonstrate that WNCW violated the FDCPA by its communication with Attorney Bobbitt on November 18, 2002. Therefore, their claim under 15 U.S.C. § 1692c(a)(2) should be denied.

To show a violation of 15 U.S.C. §1692c(a)(2), Plaintiffs Bobbitt and Rosa must demonstrate that WNCW had "actual knowledge" of which attorney represented them with regard to their dispute of the respective Plaintiffs' homeowners' association assessments. Nowhere do Plaintiffs allege that WNCW had actual knowledge of which attorney was representing them in what capacity in which action. Accordingly, as a matter of law, this claim is precluded.

In the instant case, Plaintiffs' allegations, which WNCW has not disputed, are that WNCW sent its November 18, 2002, letter to the attorney representing Plaintiffs Bobbitt and Rosa as requested by that attorney, attorney Philip Bobbitt. SMF, ¶¶ 11-12; Plaintiffs' Statement of Facts, ¶¶ 20-21. Plaintiffs' further allege

that WNCW simply sent the same exact letter to Plaintiffs Bobbitt and Rosa's address within the subdivision. Plaintiffs' Statement of Facts, ¶ 22-23. Therefore, attorney Bobbitt was in possession of the exact information his clients received. Accordingly, this Court should find that no letter from WNCW to Plaintiffs violated the FDCPA. Therefore, Plaintiffs' claim under 15 U.S.C. §1692c(a)(2) should be denied.

To the extent that this Court finds these letters to be in violation of the FDCPA, WNCW respectfully requests that this Court construe these violations to fall within the hyper-technical category of violations as no actual damage resulted from the transmission of these letters and Plaintiffs claims are not otherwise meritorious. Zagorski v. Midwest Billing Services, Inc., 128 F.3d 1164, 1166 (7th Cir. 1997); Johnson v. Eaton, 80 F.3d 148, 152 (5th Cir. 1996). Accordingly, this Court should hold that the only award of attorneys' fees it will consider on this claim is $0.00 as that is the only amount that is reasonable. Id.

### III. CONCLUSION.

Plaintiffs allege that WNCW violated the FDCPA by filing a lien on behalf of its homeowners association clients to which Plaintiffs had failed to pay their assessments and by then informing Plaintiffs of the same in the Letter. For the reasons discussed above, the Letter complies with the requirements of the FDCPA.

Additionally, WNCW's communication with Plaintiffs Bobbitt and Rosa's attorney, Phillip Bobbitt, was proper.  Finally, filing of the liens before sending the Letter and not canceling them during the verification period were not violations of the FDCPA.  Accordingly, this Court should deny Plaintiffs' motion for summary judgment in its entirety.

Respectfully Submitted,

Derek W. Johanson
Georgia Bar No. 392010
Edward M. Gilgor
Georgia Bar No. 294716

Weissman, Nowack, Curry & Wilco, P.C.
One Alliance Center
4th Floor, 3500 Lenox Road
Atlanta, Georgia 30326
(404) 926-4500
(404) 926-4600 (Fax)

*COUNSEL FOR DEFENDANT*

## <u>LOCAL RULE 5.1 CERTIFICATION</u>

Counsel certifies that the foregoing document was prepared with accordance with the type and font selections approved by Local Rule 5.1. in Times Roman 14 Point Font.

### IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

PAUL SHIMEK, III, KATHY
FORBES, GEORGE FORBES,
MILDRED BOBBITT, and
JOHN ROSA,

       **Plaintiffs,**

v.

WEISSMAN, NOWACK, CURRY
& WILCO, P.C.,

       **Defendant.**

**CIVIL ACTION
FILE NO. 1:02 CV 3020 WBH**

### CERTIFICATE OF SERVICE

This will certify that I have this day served opposing counsel in the above-referenced matter with the foregoing DEFENDANT WEISSMAN, NOWACK, CURRY & WILCO, P.C.'S RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT, by placing a copy of same in the United States Mail with proper postage affixed thereon and addressed to:

> Robert Kaiden, Esq.
> Cristina Kaiden, Esq.
> 1850 Lake Park Drive
> Suite 204
> Smyrna, Georgia 30080

27

This 10th day of February, 2003.

_____
Edward M. Gilgor

Weissman, Nowack, Curry & Wilco, P.C.
One Alliance Center
4th Floor, 3500 Lenox Road
Atlanta, Georgia 30326
(404) 926-4500
(404) 926-4600 (Fax)

268951

28

ORIGINAL
FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

FEB 1 0 2003

LUTHER D. THOMAS, Clerk
By: _____
       Deputy Clerk

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

PAUL SHIMEK, III, KATHY
FORBES, GEORGE FORBES,
MILDRED BOBBITT, and
JOHN ROSA,

      **Plaintiffs,**

v.

WEISSMAN, NOWACK, CURRY
& WILCO, P.C.,

      **Defendant.**

**CIVIL ACTION
FILE NO. 1:02 CV 3020 WBH**

## DEFENDANT WEISSMAN, NOWACK, CURRY & WILCO, P.C.'S STATEMENT OF MATERIALS FACTS NOT IN DISPUTE AND RESPONSE TO PLAINTIFFS' STATEMENT OF MATERIALS FACTS NOT IN DISPUTE

Pursuant to Local Rule 56.1B, Defendant Weissman, Nowack, Curry & Wilco, P.C. (hereinafter "WNCW"), offers the following counter-statement of material facts not in dispute and responds to Plaintiffs' statement of material facts not in dispute.

### WNCW's Counter-Statement of Material Facts Not In Dispute

1.   WNCW is a law firm that, among other things, represents Georgia community associations.  Affidavit of Mark Moore ("Moore Affidavit"), ¶

*12*

2.

2.  Plaintiffs are owners of property within two subdivisions for which WNCW represents the corresponding homeowners associations. Id., ¶¶ 2-3.

3.  WNCW sent a letter to each of the Plaintiffs informing them of the debt they owed to their respective homeowners associations, their rights under the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 *et seq.* and the fact that a lien to secure the sum had been sent to the Clerk of Court. Id., ¶ 4 and Exhibits 1, 2, 3 and 4, attached thereto.

4.  Simultaneously with the mailing of the letter referenced in Paragraph 3 to each Plaintiff, WNCW filed a lien against the property of that Plaintiff with the Clerk of the Superior Court of Cobb County Georgia. Id., ¶ 5.

5.  At no time has any judgment been entered against any of Plaintiffs with regard to the debts in question and the none of the amounts WNCW was seeking to collect had been reduced to judgment. Id., ¶ 6.

6.  WNCW informed Plaintiffs that if they disputed the debt in writing, WNCW would obtain verification of the debt.  Id., ¶ 4.  Plaintiffs' Complaint, ¶ 24.

2

7. In the instant matters WNCW was representing the original creditors of Plaintiffs. Moore Affidavit, ¶ 7.

8. WNCW sent the liens to the Clerk of Court contemporaneously with sending the demand letters to Plaintiffs and long before verification of the debt was requested by Plaintiffs. Id., ¶ 5.

9. Both of the homeowners associations at issue in the instant case have declarations of covenants that specifically provide that a lien arises in their favor in the event an owner fails to pay assessments. Id., ¶ 10 and Exhibit 6 attached thereto at Art. IV, § 2. Id., ¶ 18 and Exhibit 7 attached thereto at Art. V, § 1.

10. WNCW took no further action to foreclose upon the liens after they were filed. Id., ¶ 21.

11. Phillip L. Bobbitt is an attorney licensed to practice law in Georgia. Id., ¶ 8.

12. On June 24, 2002, Phillip Bobbitt wrote to WNCW on Plaintiffs Bobbitt and Rosa's behalf regarding their debt to WNCW's client. Id., ¶ 8.

13. Other than Pleadings in the instant suit, WNCW has never received any communication from the Kaidens indicating they also represented

3

Plaintiffs Bobbitt and Rosa with regard to the underlying debt alleged by
WNCW's client or that any communication with Attorney Bobbitt was no
longer proper. Id., ¶ 9.

## WNCW's Response to Plaintiffs' Statement of Material Facts Not In Dispute

1.  WNCW does not dispute this statement.

2.  WNCW does not dispute this statement.

3.  Defendant admits that WNCW is a professional corporation organized
    under the laws of Georgia and doing business within the State of Georgia.
    Defendant admits that WNCW is a law firm that provides legal services to
    its community association clients and that some of those legal services are
    to assist them in pursuing the recovery of unpaid community association
    assessments due but unpaid.   Defendant admits that WNCW has provided
    legal services to Chestnut Hill Homeowners Association, Inc. and
    Cheatham Lakes Homeowners Association, Inc. to assist them in collecting
    unpaid community association assessments owed to them, but unpaid by
    members of those associations.  Moore Affidavit, ¶¶ 2-3.

4.  WNCW does not dispute this statement.

5.  WNCW does not dispute this statement.

4

6.   WNCW does not dispute this statement.

7.   WNCW does not dispute this statement.

8.   WNCW disputes this paragraph because WNCW does not have the ability

to record liens.  Price v. Fulton County Com'n, 170 Ga.App. 736, 737, 318

S.E.2d 153, 155  (1984)(*citing* OCGA § 15-6-61 *et seq.*)(holding that

"among the clerk's numerous duties is the responsibility of keeping various

docket books, and books for recording deeds, mortgages and other liens,

and bills of sale . . .); Mobley v. Bent Tree Community, Inc., 240 Ga. App.

220, 523 S.E.2d 69 (1999) (finding that the date a party files a document

with the Court can be very different from the date the Clerk actually gets

around to recording it on the official docket book); O.C.G.A. § 42-2-

2(a)&(b).

WNCW admits that on  May 16, 2002, it sent a lien for filing to the

Clerk of the Superior Court of Cobb County, Georgia.  Moore Affidavit, ¶

11.  WNCW admits that on June 4, 2002, the Court Clerk actually recorded

the lien against Plaintiff Shimek's property.  Id., ¶ 12.

WNCW asserts that this statement is improper to the extent that it

seeks to draw a legal conclusion regarding the recording of a lien.

5

WNCW disputes that this statement is material to Plaintiff's Motion for Partial Summary Judgment.

9.   WNCW does not dispute this statement.

10.  WNCW disputes this statement and disputes that the statement is material to Plaintiffs' Motion for Partial Summary Judgment. WNCW sent this lien to the Clerk for filing on May 16, 2002. Id., ¶ 11. The Clerk recorded the lien on August 16, 2002. Id. at ¶ 12.  WNCW canceled this lien on July 12, 2002.  Id. at ¶ 13. The Clerk recorded the cancellation of the lien on August 16, 2002. Id. at ¶ 14.

11.  WNCW does not dispute this statement.

12.  WNCW disputes this statement and disputes that the statement is material to Plaintiffs' Motion for Partial Summary Judgment.  WNCW never received a letter from Plaintiff Forbes disputing the debt. Id. at ¶ 17.

13.  WNCW disputes this paragraph to the extent that Plaintiff seeks to assert that WNCW, or any private party has the ability to record liens.  Price v. Fulton County Com'n, 170 Ga.App. 736, 737, 318 S.E.2d 153, 155 (1984)(*citing* OCGA § 15-6-61 *et seq.*)(holding that "among the clerk's numerous duties is the responsibility of keeping various docket books, and

6

books for recording deeds, mortgages and other liens, and bills of sale . . .);
Mobley v. Bent Tree Community, Inc., 240 Ga. App. 220, 523 S.E.2d 69
(1999) (finding that the date a party files a document with the Court can be
very different from the date the Clerk actually gets around to recording it
on the official docket book); O.C.G.A. § 42-2-2(a)&(b).

WNCW admits that on May 6, 2002, it sent a lien for filing to the
Clerk of the Superior Court of Cobb County, Georgia. Moore Affidavit, ¶
15. WNCW admits that on May 15, 2002, the Court Clerk actually
recorded the lien against Plaintiff Forbes' property. Id. at ¶ 16.

WNCW asserts that this statement is improper to the extent that it
seeks to draw a legal conclusion regarding the recording of a lien.

WNCW disputes that this statement is material to Plaintiff's Motion
for Partial Summary Judgment.

14. WNCW does not dispute this statement. WNCW disputes that this
statement is material to Plaintiff's Motion for Partial Summary Judgment.
WNCW never validated Plaintiff Forbes' debt because Plaintiff Forbes
never disputed the debt. Id. at ¶ 17.

15. WNCW does not dispute this statement.

16. WNCW does not dispute this statement.

17. WNCW denies this paragraph to the extent that Plaintiffs seek to assert that WNCW, or any private party has the ability to record liens. Price v. Fulton County Com'n, 170 Ga.App. 736, 737, 318 S.E.2d 153, 155  (1984)(*citing* OCGA § 15-6-61 *et seq.*)(holding that "among the clerk's numerous duties is the responsibility of keeping various docket books, and books for recording deeds, mortgages and other liens, and bills of sale . . .); Mobley v. Bent Tree Community, Inc., 240 Ga. App. 220, 523 S.E.2d 69 (1999) (finding that the date a party files a document with the Court can be very different from the date the Clerk actually gets around to recording it on the official docket book); O.C.G.A. § 42-2-2(a)&(b).

WNCW admits that on  June 19, 2002,  it sent a lien for filing to the Clerk of the Superior Court of Cobb County, Georgia.  Moore Affidavit, ¶ 19.

WNCW admits that on July 10, 2002, the Court Clerk actually recorded the lien against Plaintiffs Bobbitt and Rosa's property. Id., ¶ 20.

WNCW asserts that this statement is improper to the extent that it seeks to draw a legal conclusion regarding the recording of a lien.

8

WNCW disputes that this statement is material to Plaintiffs' Motion for Partial Summary Judgment.

18. WNCW does not dispute this statement.

19. WNCW does not dispute this statement.

20. WNCW does not dispute this statement.

21. WNCW does not dispute this statement.

22. WNCW does not dispute this statement.

23. WNCW does not dispute this statement.

24. WNCW does not dispute that its notice letters did not recapitulate verbatim, the text of 15 U.S.C. § 1692g(a)(4).

To the extent that Plaintiffs are attempting to draw a legal conclusion, this not a proper statement of material fact.  WNCW denies that it failed to meet any requirements of 15 U.S.C. § 1692g(a)(4).

WNCW disputes that this statement is material to Plaintiffs' Motion for Partial Summary Judgment.

25. WNCW does not dispute that its notice letters did not recapitulate verbatim, the text of 15 U.S.C. § 1692g(a)(5).

9

To the extent that Plaintiffs are attempting to draw a legal conclusion,

this not a proper statement of material fact.  WNCW denies that it failed to

meet any requirements of 15 U.S.C. § 1692g(a)(5).

WNCW disputes that this statement is material to Plaintiffs' Motion

for Partial Summary Judgment.

Respectfully Submitted,

Derek W. Johanson
Georgia Bar No. 392010
Edward M. Gilgor
Georgia Bar No. 294716

Weissman, Nowack, Curry & Wilco, P.C.
One Alliance Center
4th Floor, 3500 Lenox Road
Atlanta, Georgia 30326
(404) 926-4500
(404) 926-4600 (Fax)

**COUNSEL FOR DEFENDANT**

10

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

PAUL SHIMEK, III, KATHY
FORBES, GEORGE FORBES,
MILDRED BOBBITT, and
JOHN ROSA,

     **Plaintiffs,**

v.

WEISSMAN, NOWACK, CURRY
& WILCO, P.C.,

     **Defendant.**

**CIVIL ACTION
FILE NO. 1:02 CV 3020 WBH**

## AFFIDAVIT OF MARK MOORE

Personally appeared before the undersigned, a notary public duly authorized to administer oaths in the State of Georgia, Mark Moore, who, having been duly sworn, deposes and states of his own personal knowledge the following:

1.

I am Mark Moore. I am of legal age, under no legal disability and make this affidavit upon my knowledge of the facts.

2.

I am an attorney, duly authorized to practice law in the State of Georgia, associated with the law firm of Weissman, Nowack, Curry & Wilco, P.C. (hereinafter "WNCW"), One Alliance Center, 4th Floor, 3500 Lenox Road, Atlanta, Georgia

**EXHIBIT
A**

30326. As part of its legal practice, WNCW represents Community Associations in the State of Georgia.

3.

WNCW represents Cheatham Lakes Homeowners Association, Inc. (hereinafter "Cheatham Lakes") and Chestnut Hill Homeowners Association, Inc. (hereinafter "Chestnut Hill") in the collection of unpaid assessments owed to them by their respective homeowners.

4.

Attached as Exhibits 1, 2, 3 and 4 to this Affidavit are true and correct copies of letters WNCW sent to Plaintiffs Shimek, Forbes, Bobbitt and Rosa regarding their unpaid assessments to Chestnut Hill and Cheatham Lakes, respectively.

5.

On the same day that the letters referenced in Paragraph 4 were sent to Plaintiffs Shimek, Forbes, Bobbitt and Rosa, WNCW also filed a lien to secure the overdue amounts with the Clerk of the Superior Court of Cobb County, Georgia for recordation.

2

6.

WNCW was not collecting upon a judgment in favor of Chestnut Hill or Cheatham Lakes against Plaintiffs Shimek, Forbes, Bobbitt and Rosa. Additionally, the amounts WNCW was collecting were not and are not secured by a judgment.

7.

Chestnut Hill and Cheatham Lakes is the original creditor of Plaintiffs Shimek, Forbes, Bobbitt and Rosa of the amounts referenced in WNCW's letters to them. No other creditor is involved.

8.

I have researched the Georgia Bar Directory and have found that Phillip L. Bobbitt, the person to whom I sent the letters that are Exhibits 3 and 4 to Plaintiffs' First Amended Complaint, is an attorney licensed to practice law in the State of Georgia. Attached hereto as Exhibit 5 is a copy of the on-line Georgia Bar Directory information sheet on Attorney Bobbitt.

WNCW received a letter from Attorney Bobbitt, attached as Composite Exhibit 2 to Plaintiffs' Complaint, which clearly indicates that he is an attorney.

3

9.

WNCW has received no notice from the attorneys representing the Plaintiffs in the instant FDCPA lawsuit that they, and only they, represent Plaintiffs Bobbitt and Rosa with regard to the underlying debt. The only communication to WNCW from an attorney in this regard has been from attorney Bobbitt.

10.

Attached hereto as Exhibit 6 is a true and correct copy of the Declaration of Protective Covenants, Conditions, Restrictions and Easements for the Chestnut Hill Subdivision recorded at Deed Book 3762, Page 465, Cobb County, Georgia Land Records.

11.

On May 16, 2002, WNCW filed a lien on behalf of the Chestnut Hill against the real property located at 706 Larkspur Boulevard, Acworth, Georgia 30102 with the Clerk of the Superior Court of Cobb County, Georgia for recordation.

12.

On August 16, 2002, the Clerk of the Superior Court of Cobb County, Georgia recorded this lien against the real property located at 706 Larkspur Boulevard, Acworth, Georgia 30102.

4

13.

On July 12, 2002, WNCW canceled this lien against the real property located at 706 Larkspur Boulevard, Acworth, Georgia 30102.

14.

On August 16, 2002, the Clerk of the Superior Court of Cobb County, Georgia recorded the cancellation of this lien against the real property located at 706 Larkspur Boulevard, Acworth, Georgia 30102.

15.

On May 6, 2002, WNCW filed a lien on behalf of Chestnut Hill against the real property owned by Plaintiff Forbes with the Clerk of the Superior Court of Cobb County, Georgia for recordation.

16.

On May 15, 2002, the Clerk of the Superior Court of Cobb County, Georgia recorded the lien referenced in Paragraph 15.

17.

Plaintiff Forbes' debt was never validated by WNCW because Plaintiff Forbes never disputed the debt.

5

18.

Attached hereto as Exhibit 7 is a true and accurate copy of the Declaration of Protective Covenants for the Cheatham Lakes Subdivision recorded at Deed Book 8536, Page 189, Cobb County, Georgia Land Records.

19.

On June 19, 2002, WNCW filed a lien on behalf of Cheatham Lakes against the real property owned by Plaintiffs Bobbitt and Rosa with the Clerk of the Superior Court of Cobb County, Georgia for recordation.

20.

On July 10, 2002, the Clerk of the Superior Court of Cobb County, Georgia recorded the lien referenced in Paragraph 19.

21.

WNCW took no further action to foreclose upon the any of the liens referenced in this Affidavit after they were filed.

6

22.

I have read the foregoing and it is true and correct and is based upon my personal knowledge of the facts and I authorize its use for any and all purposes allowed by law.

FURTHER AFFIANT SAYETH NOT.

_____
Mark Moore

Sworn to and subscribed before me this 10th day of February, 2003.

_____
Notary Public

My Commission Expires:
December, 20, 2003

[SEAL]

7

WEISSMAN, NOWACK, CURRY & WILCO, P.C.
ATTORNEYS

TWO MIDTOWN PLAZA • 15TH FLOOR
1349 WEST PEACHTREE STREET
ATLANTA, GEORGIA 30309
TELEPHONE
404·885·9215
FACSIMILE
404·885·9214

May 16, 2002

Paul Shimek
706 Larkspur Boulevard
Acworth, GA 30102

Re:  706 Larkspur Boulevard, Acworth, GA 30102

Dear Mr.  Shimek:

This firm represents Chestnut Hill Homeowners Association, Inc..  Our client's records show that you are the owner of property at Chestnut Hill.  If this information is not correct, please notify us.

Our client's records indicate that, as of the date of this letter, you owe a total of $260.00 in past due assessments and charges to Chestnut Hill Homeowners Association, Inc..  This firm has been engaged to collect this debt.  This letter is to notify you that, pursuant to the governing documents for Chestnut Hill Homeowners Association, Inc., a lien has been sent to the Clerk of Court to secure this sum.

You have thirty (30) days after you receive this letter to dispute the validity of the debt or any part of it.  If you do not dispute the above-referenced debt within that period, we can assume that the debt is valid.  If you dispute it, by notifying us in writing to that effect, we will, as required by law, obtain and mail verification of the debt to you.

If you want to resolve this matter, you must, no later than thirty (30) days after your receipt of this letter, either pay $260.00 or notify us that you dispute the debt.  Although we have requested that you pay $260.00 within thirty (30) days following your receipt of this letter, our request does not eliminate your right to dispute this debt within the same thirty (30) day period (i.e. within thirty (30) days of receipt of this letter).  If you dispute this debt by notifying us in writing, we will cease any efforts to collect the debt until we have mailed verification of this debt to you.

All payments must be made by cashier's check or money order, payable to the Association and sent to this office.  If you have any questions, please contact our collection department for assistance.  This letter is an attempt to collect a debt, and any information obtained will be used for that purpose.

Sincerely,

Julie Howard

EXHIBIT
1

## WEISSMAN, NOWACK, CURRY & WILCO, P.C.

ATTORNEYS

TWO MIDTOWN PLAZA • 15TH FLOOR
1349 WEST PEACHTREE STREET
ATLANTA, GEORGIA 30309

TELEPHONE
404·885·9215

FACSIMILE
404·885·9214

May 6, 2002

George Forbes
4503 Grapevine Court
Acworth, GA 30102

Re:  4503 Grapevine Court, Acworth, GA 30102

Dear Mr. Forbes:

This firm represents Chestnut Hill Homeowners Association, Inc..  Our client's records show that you are the owner of property at Chestnut Hill.  If this information is not correct, please notify us.

Our client's records indicate that, as of the date of this letter, you owe a total of $540.00 in past due assessments and charges to Chestnut Hill Homeowners Association, Inc..  This firm has been engaged to collect this debt.  This letter is to notify you that, pursuant to the governing documents for Chestnut Hill Homeowners Association, Inc., a lien has been sent to the Clerk of Court to secure this sum.

You have thirty (30) days after you receive this letter to dispute the validity of the debt or any part of it.  If you do not dispute the above-referenced debt within that period, we can assume that the debt is valid.  If you dispute it, by notifying us in writing to that effect, we will, as required by law, obtain and mail verification of the debt to you.

If you want to resolve this matter, you must, no later than thirty (30) days after your receipt of this letter, either pay $540.00 or notify us that you dispute the debt.  Although we have requested that you pay $540.00 within thirty (30) days following your receipt of this letter, our request does not eliminate your right to dispute this debt within the same thirty (30) day period (i.e. within thirty (30) days of receipt of this letter).  If you dispute this debt by notifying us in writing, we will cease any efforts to collect the debt until we have mailed verification of this debt to you.

All payments must be made by cashier's check or money order, payable to the Association and sent to this office.  If you have any questions, please contact our collection department for assistance.  This letter is an attempt to collect a debt, and any information obtained will be used for that purpose.

Sincerely,

Julie Howard

EXHIBIT

2

WEISSMAN, NOWACK, CURRY & WILCO, P.C.

ATTORNEYS

TWO MIDTOWN PLAZA • 15TH FLOOR
1349 WEST PEACHTREE STREET
ATLANTA, GEORGIA 30309

TELEPHONE
404 885·9215

FACSIMILE
404 885·9214

June 19, 2002

Mildred Coffey Bobbitt
c/o Phillip L. Bobbitt
840 Kennesaw Avenue, Ste 9
Marietta, GA 30060

Re:  6282 Cheatham Lake Drive, Acworth, GA 30101

Dear Mr. Bobbitt:

This firm represents Cheatham Lakes Homeowners Association, Inc.. Our client's records show that you are the owner of property at Cheatham Lakes. If this information is not correct, please notify us.

Our client's records indicate that, as of the date of this letter, you owe a total of $813.50 in past due assessments and charges to Cheatham Lakes Homeowners Association, Inc.. This firm has been engaged to collect this debt. This letter is to notify you that, pursuant to the governing documents for Cheatham Lakes Homeowners Association, Inc., a lien has been sent to the Clerk of Court to secure this sum.

You have thirty (30) days after you receive this letter to dispute the validity of the debt or any part of it. If you do not dispute the above-referenced debt within that period, we can assume that the debt is valid. If you dispute it, by notifying us in writing to that effect, we will, as required by law, obtain and mail verification of the debt to you.

If you want to resolve this matter, you must, no later than thirty (30) days after your receipt of this letter, either pay $813.50 or notify us that you dispute the debt. Although we have requested that you pay $813.50 within thirty (30) days following your receipt of this letter, our request does not eliminate your right to dispute this debt within the same thirty (30) day period (i.e. within thirty (30) days of receipt of this letter). If you dispute this debt by notifying us in writing, we will cease any efforts to collect the debt until we have mailed verification of this debt to you.

All payments must be made by cashier's check or money order, payable to the Association and sent to this office. If you have any questions, please contact our collection department for assistance  This letter is an attempt to collect a debt, and any information obtained will be used for that purpose.

Sincerely,

*Mark Moore* (signature)

Mark A. Moore

EXHIBIT
3

WEISSMAN, NOWACK, CURRY & WILCO, P.C.

ATTORNEYS

TWO MIDTOWN PLAZA • 15TH FLOOR
1349 WEST PEACHTREE STREET
ATLANTA, GEORGIA 30309

TELEPHONE
404 · 885 · 9215

FACSIMILE
404 885 · 9214

June 19, 2002

John Rosa
c/o Phillip L. Bobbitt
840 Kennesaw Avenue, Ste 9
Marietta, GA 30060

Re:  6282 Cheatham Lake Drive, Acworth, GA 30101

Dear Mr. Bobbitt:

This firm represents Cheatham Lakes Homeowners Association, Inc.. Our client's records show that you are the owner of property at Cheatham Lakes.  If this information is not correct, please notify us.

Our client's records indicate that, as of the date of this letter, you owe a total of $813.50 in past due assessments and charges to Cheatham Lakes Homeowners Association, Inc.. This firm has been engaged to collect this debt.  This letter is to notify you that, pursuant to the governing documents for Cheatham Lakes Homeowners Association, Inc., a lien has been sent to the Clerk of Court to secure this sum.

You have thirty (30) days after you receive this letter to dispute the validity of the debt or any part of it.  If you do not dispute the above-referenced debt within that period, we can assume that the debt is valid.  If you dispute it, by notifying us in writing to that effect, we will, as required by law, obtain and mail verification of the debt to you.

If you want to resolve this matter, you must, no later than thirty (30) days after your receipt of this letter, either pay $813.50 or notify us that you dispute the debt.  Although we have requested that you pay $813.50 within thirty (30) days following your receipt of this letter, our request does not eliminate your right to dispute this debt within the same thirty (30) day period (i.e. within thirty (30) days of receipt of this letter).  If you dispute this debt by notifying us in writing, we will cease any efforts to collect the debt until we have mailed verification of this debt to you.

All payments must be made by cashier's check or money order, payable to the Association and sent to this office.  If you have any questions, please contact our collection department for assistance.  This letter is an attempt to collect a debt, and any information obtained will be used for that purpose.

Sincerely,

Mark A. Moore

EXHIBIT
4



# State Bar of Georgia

| HOME | SITE MAP | DIRECTORY | CHECK CLE | SEARCH |

## Search Results:

### Modify Search

Details:

**Mr. Phillip L. Bobbitt**
Bobbitt & Associates
840 Kennesaw Ave. NW,
Suite # 9
Marietta, GA 30060
Phone: 678-784-2580
Fax: 678-784-2585
E-Mail:
bobbittlaw@msn.com

Admit Date: 06/12/1979
Law School: Woodrow
Wilson Col.of Law

Status: Active Member in
Good Standing

First Name:

Last Name:

Section:

Company:

City:

State:

Zip:

Submit Query

Return to Previous Page

© 2002 State Bar of Georgia    Disclaimer    Directions to Our Offices    Contact the Webmaster
104 Marietta St. NW, Suite 100 Atlanta. GA 30303
(800) 334-6865   (404) 527-8700



EXHIBIT
5

http://www.gabar.org/Gabarsearch.asp?ID=25484&page=1                                    12/6/2002

DECLARATION OF COVENANTS, CONDITIONS, RESTRICTIONS
AND EASEMENTS FOR CHESTNUT HILL SUBDIVISION

THIS DECLARATION, made this _17TH_ day of _DEC._,
1985, by COTTON STATES PROPERTIES, LTD., a Georgia corporation
(hereinafter the "Developer"), as follows:

W I T N E S S E T H:

WHEREAS, Developer is the owner of certain real
property lying and being in Land Lots 1, 2, 71, 72, 73 and 74 of
the 16th District, 2nd Section, Cobb County, Georgia and being
known as CHESTNUT HILL, and being more particularly described
and delineated by a plat prepared by Rodenberger & Associates,
Inc., Georgia Registered Land Surveyors, dated _December 18_,
1985, and recorded in Plat Book _105_, Page _40_ Records of Cobb
County, Georgia (hereinafter referred to as the "Property");

WHEREAS, Developer desires to provide for the
preservation and enhancement of the property values in Chestnut
Hill and for the maintenance of property and improvements
thereon, and to this end desire to subject the Property to the
covenants, conditions, restrictions, easements, charges and
liens hereinafter set forth, each and all of which are for the
benefit of said property and each owner thereof; and

WHEREAS, Developer has deemed it desirable, for the
efficient preservation of the values in Chestnut Hill, to create
an agency to which should be delegated and assigned the powers
of owning, maintaining and administering the common area and
improvements thereon and administering and enforcing the
covenants and restrictions and collecting and disbursing the
assessments and charges hereinafter created; and

WHEREAS, Developer will cause to be incorporated under
the laws of the State of Georgia the Chestnut Hill Homeowners
Association, Inc., a non-profit corporation, for the purpose of
exercising the aforesaid functions.

NOW, THEREFORE, Developer declares that the real
property described above is and shall be held, transferred,
sold, mortgaged, conveyed, leased, occupied and used subject to
the covenants, conditions, restrictions, easements, charges and
liens hereinafter set forth.

ARTICLE I
DEFINITIONS

Section 1. "Architectural Control Committee" shall
mean and refer to Cotton States Properties, Ltd., Developer,
or such other individuals as Developer may appoint, until all
lots in Chestnut Hill shall have been fully developed and
permanent improvements constructed thereon and sold to permanent
residents.

Section 2. "Association" shall mean and refer to
Chestnut Hill Homeowners Association, Inc., its successors and
assigns.

MOORE & ROGERS
Attorneys At Law
Suite 100
100 Anderson Street
Marietta, Georgia 30060
(404) 429-1499



EXHIBIT
6

COBB SUPERIOR COURT CLERK

FILED AND RECORDED
'85 DEC 18 AM 11:59

BOOK 3762 PAGE 465

Section 3. "Board" shall mean and refer to the Board of Directors of the Association.

Section 4. "Common Area" shall mean all real and personal property now or hereafter owned by the Association for the common use and enjoyment of the owners.

Section 5. "Common Exchange" shall mean and refer to the actual and estimated expenses of operating the Association, including any reasonable reserve, all as may be found to be necessary and appropriate by the Board pursuant to the Declaration and the By-laws and Articles of Incorporation of the Association.

Section 6. "Declaration" shall mean the covenants, conditions, restrictions and easements and all other provisions herein set forth in this entire document, as may from time to time be amended.

Section 7. "Developer" shall mean and refer to Cotton States Properties, Ltd., a Georgia corporation, or any successor in title or any successor in interest to Cotton States Properties, Ltd. to all or any portion of the Property then subject to this Declaration, provided in the instrument of conveyance to any such successor in title or interest.

Section 8. "Lot" shall mean and refer to residential lots, as well as any future lots subject to the within covenants, conditions, restrictions and easements by the Developer in Chestnut Hill Subdivision or any expansion thereof by Developer.

Section 9. "Owner" shall mean and refer to the record owner, whether one or more persons, of the fee simple title to any lots which is part of the Property, but excluding those having such interest merely as security for the performance of an obligation.

Section 10. "Person" shall mean and refer to a natural person, corporation, partnership, association, trust or other legal entity, or any combination thereof.

Section 11. "Property" shall mean and refer to that certain real property described in the above referenced plat.

Section 12. "Structure" shall mean and refer to:

(i) any thing or object the placement of which upon any Lot may affect the appearance of such Lot, including by way of illustration and not limitation, any building or part thereof, garage, porch, gazebo, shed, greenhouse or bathhouse, coop or cage, covered or uncovered patio, swimming pool, tennis court, fence, curbing, paving, wall, tree, shrub, sign, signboard, mailbox, driveway, temporary or permanent living quarters (including any house trailer) or any other temporary or permanent improvement to such Lot;

(ii) any excavation, grading, fill ditch, diversion dam or other thing, object or device which affects or alters the natural flow of surface waters from, upon or across any Lot, or which affects or alters the flow of any waters in any natural or artificial creek, stream, wash or drainage channel from, upon or across any Lot; and

(iii) any change in grade at any point on a Lot of more than six (6) inches, whether or not subsection (ii) of this Section 12 applies to such change.

-2-

MOORE & ROGERS
Attorneys At Law
Suite 100
100 Anderson Street
Marietta, Georgia 30060
(404) 475-1498

ARTICLE II
ARCHITECTURAL CONTROL COMMITTEE

Section 1. Purpose, Powers and Duties of the Architectural Control Committee.

(a) The purpose of the Architectural Control Committee is to assure that the installation, construction or alteration of any Structure on any Lot is in accordance with the standards determined by the Architectural Control Committee. To the extent necessary to carry out such purpose, the Architectural Control Committee shall have all of the powers and duties to do each and every thing necessary, suitable, convenient or proper for, or in connection with or incidental to, the accomplishment of such purpose, including, without being limited to, the power and duty to approve or disapprove plans and specifications for any installation, construction or alteration of any structure on any Lot.

(b) To preserve the architectural appearance of the neighborhood, no construction or placement of improvements of any nature whatsoever shall be commenced or maintained by any owner, his family, tenants, visitors, guests, servants, and agents with respect to the exterior of any house or with respect to any other portion of any lot or other parcel of land, including without limitation, the construction or installation of sidewalks, driveways, decks, patios, swimming pools, tennis courts, greenhouses, playhouses, garages, guest or servants' quarters, or other outbuildings, nor shall any exterior addition to or change or alteration therein be made, unless and until the plans and specifications showing the nature, color, type, shape, height, materials, and location of the same shall have been submitted to and approved in writing as to the harmony of external design, location, and appearance in relation to surrounding structures and topography by the Architectural Control Committee. The Architectural Control Committee shall have the sole discretion to determine whether the plans and specifications submitted for approval are acceptable and in compliance with the total scheme of the neighborhood. If same are not approved or disapproved within thirty (30) days from date submitted, then same shall be approved by default.

ARTICLE III
MEMBERSHIP AND VOTING RIGHTS

Section 1. Membership. Every owner of a Lot which is subject to this Declaration shall be a mandatory member of the Association. The foregoing is not intended to include persons or entities who hold an interest merely as security for the performance of an obligation. Membership shall be appurtenant to and may not be separated from ownership of any Lot which is subject to this Declaration and shall pass automatically to an Owner's successor-in-title to the Lot.

Section 2. Voting Rights. The Association shall have three classes of voting membership:

Class A:   Initially, the Class A members shall be all owners, with the exception of the Developer, and shall be entitled to one vote for each Lot owned. When more than one Person holds an interest in any Lot, all such Persons shall be members. The vote for such Lot shall be exercised as they among themselves determine, but in no event shall more than one vote be cast with

MOORE & ROGERS
Attorneys At Law
Suite 100
110 American Street
Marietta, Georgia 30060
(404) 429-1499

-3-

respect to any Lot.   If multiple owners of a lot cannot unanimously decide how to cast their vote, then no vote may be cast regarding the ownership by that particular Lot.

Class B:   The Class B member is voluntary and includes the right to the use and enjoyment of the swimming pool, tennis cours and ancillary facilities, subject to the rules therefor hereinafter set forth.   Class B members are also Class A members and entitled to all rights and privileges            thereof.

Class C:   The Class C member shall be the Developer and shall be entitled to three (3) votes for each Lot owned.   The Class C membership shall cease and be converted to Class A membership on the happening of any of the following events:

(a)   seven (7) years from the date of this Declaration; or

(b)   when, in its discretion, the Developer so determines.

## ARTICLE IV
## PROPERTY RIGHTS

Section 1.  Member's Easement of Enjoyment.  Subject to the provisions herein, every member of the Association shall have a right and easement of use and enjoyment in and to the Common Area (including, without limitation, the right of pedestrian (but not vehicular) access, ingress and egress to and from his Lot over those portions of the Common Area from time to time designated for such purposes), which right and easement shall be appurtenant to and shall pass with the title to every Lot, subject to the following:

(a)   the right of the Association to adopt and publish rules and regulations governing the use of the Common Area.

(b)   the right of the Association to borrow money for the purpose of improving the Common Area or any portion thereof, or constructing, repairing or improving any facilities located or to be located thereon, and, upon the assent of two-thirds of the Class A and B members and the Class C member, if any, to give as security a mortgage conveying all or any portion of the Common area.  The lien and encumbrance of any such mortgage, however, shall be subject and subordinate to all rights, interests, easements and privileges herein reserved or established for the benefit of Developer, any Owner, or the holder of any mortgage, irrespective of when executed, given by Developer.

(c)   the right of the Association to dedicate or transfer all or any part of the Common Area to any public agency, authority or utility for such purposes and subject to such conditions as may be agreed to by the members.   No such dedication or transfer shall be effective unless an instrument signed by two-thirds (2/3) of each class of members, agreeing to such dedication or transfer, has been recorded.

MOORE & ROGERS
Attorneys At Law
Suite 100
150 Anderson Street
Marietta, Georgia 30060
(404) 429-1499

-4-

(d)  the easements reserved in Article VII of this Declaration.

Section 2.  Declaration of Use.  Any owner may delegate, in accordance with the By-laws, his right of use and enjoyment in and to the Common Area and the improvements thereon to the members of his family, his tenants, guests and invitees, subject to such regulations and fees as may be established from time to time by the Association.

Section 3.  Title to Common Area.  Title to the Common Area will be conveyed to the Association by the Developer, and approved by the Association, after all lots placed for sale by the Developer have been sold or at such earlier time as the Developer may elect, and only at such time shall the Association have the right to control said property subject to the terms herein.

Section 4.  No Partition.  There shall be no judicial partition of the Property or any part thereof, nor shall any Person acquiring any interest in the Property or any part thereof seek any such judicial partition unless the Property has been removed from the provisions of this Declaration.

ARTICLE V
COVENANT FOR MAINTENANCE AND CAPITAL IMPROVEMENT ASSESSMENTS

Section 1.  Creation of the Lien and Personal Obligation of Assessments.  Each owner of a Lot, by acceptance of a deed therefor, whether or not it shall be so expressed in such deed, is deemed to covenant and agree to pay to the Association:  (1)  annual assessments, and (2) special assessments for capital improvements, such assessments to be established and collect as hereinafter provided.  The annual and special assessments, together with interest thereon and costs of collection thereof, as hereinafter provided, including reasonable attorney's fees, shall be a charge and a continuing lien upon the Lot against which each such assessment is made.  Each such assessment, together with interest thereon and costs of collection thereof, including reasonable attorney's fees, shall also be the personal obligation of the person who was the owner of such Lot at the time when assessment fell due.  The personal obligation for delinquent assessments shall not pass to his successors in title unless expressly assumed by them.

Section 2.  Purpose of Assessments.  The assessments levied by the Association shall be used exclusively for promoting the health, safety, pleasure and welfare of the owners of the Lots and the costs and expenses incident to the operation of the Association, including without limitation the maintenance and repair of the Common Area and improvements thereon, the maintenance of services furnished by the Association, the purchase of insurance by the Association, the repair and replacement of improvements on the Common Area, payment of all taxes, insurance premiums and all costs and expenses incidental to the operation and administration of the Association, and establishment and maintenance of a reasonable reserve fund or funds.

Section 3.  Computation of Annual Assessments.  It shall be the duty of the Board at least thirty (30) days prior to the Association's annual meeting to prepare a budget covering the estimated Common Expenses of operating the Association for the coming year, such budget to include a capital contribution or reserve account in accordance with the capital needs of the

MOORE & ROGERS
Attorneys At Law
Suite 100
182 Anderson Street
Marietta, Georgia 30060
(404) 428-1499

-5-

Association. This budget shall be divided into two (2) cate-
gories, as follows:

    (a)  expenses relating to the Common Area excluding swim-
        ming pool, tennis courts and ancillary facilities
        which shall be assessed against all Class A and Class
        B members in the manner hereinafter provided.

    (b)  expenses relating to the upkeep, repair, maintenance
        and operation of the swimming pool, tennis courts and
        ancillary facilites which shall be assessed against
        Class B members in the manner hereinafter provided.

The budget and the proposed annual assessments to be levied
against each Lot shall be delivered to each owner no later than
ten (10) days prior to such annual meeting. The annual assess-
ments shall be equally divided among the Lots occupying the
appropriate category so that the annual assessments shall be the
same for each Lot dependent upon the category which each Lot
occupies. The budget and the annual assessments shall become
effective unless disapproved at the annual meeting by either (i)
Developer, so long as there is a Class C member, or (ii) a vote
of a majority of the owners voting in person or by proxy at such
meeting on the date when there is no longer a Class C member.
In the event the proposed budget is not approved or the Board
fails for any reason to determine the budget for the succeeding
year, then until a budget has been determined as provided here-
in, the budget and annual assessments in effect for the then
current year shall continue for the succeeding year.  If any
budget at any time proves inadequate for any reason, the Board
may call a meeting of the Association for the approval of a
special assessment.

        Section 4.  Special Assessments.  In addition to the
annual assessments authorized above, the Association may levy,
in any assessment year, special assessments for Common Expenses,
applicable to that year only, provided that any such assessment
shall have the assent of a majority of the votes of the members
of each class voting in person or by proxy at a meeting duly
call for such purpose, and so long as such assessment applies to
the appropriate category therefor.

        Section 5.  Notice for Any Action Authorized Under
Sections 3 and 4.  Written notice of any meeting called for the
purpose of taking any action authorized under Section 3 or 4
above shall be sent to all members not less than ten (10) days
nor more than thirty (30) days in advance of the meeting.

        Section 6.  Rate of Assessment.  Annual and special
assessments must be fixed at a uniform rate for all Lots within
the special categories set forth hereinabove.

        Section 7.  Date of Commencement of Annual Assess-
ments: Due Dates.  The annual assessments provided for herein
shall commence as to all Lots on _____.  Anything
contained herein to the contrary notwithstanding, Developer, on
behalf of itself and its successors and assigns, covenants and
agrees to pay the annual assessment for each Lot owned by
Developer which contains an occupied residence; provided,
however, Developer shall not be responsible for assessments on
Lots not containing an occupied residence.  Developer shall,
however, fund any deficit which may exist between assessments
and the annual budget for as long as there is a Class C member
of the Association.  The due dates shall be established by the

MOORE & ROGERS
Attorneys At Law
Suite 100
100 Anderson Street
Marietta, Georgia 30060
(404) 429-1400

-6-

Developer until there is no longer a Class C member, and then by the Board. The Association shall, upon demand, and for a reasonable charge, not to exceed Ten Dollars ($10.00), furnish a certificate signed by an officer of the Association setting forth whether the assessments on a specified Lot have been paid. A properly executed certificate of the Association as to the status of assessments on a specified Lot is binding upon the Association as of the date of its issuance. If the Association fails to respond to any such request within ten (10) days after receipt of such request, any lien then outstanding shall be deemed to have been extinguished. All such requests shall be sent to the Association in the same manner as provided for notices in Section 6 hereof.

Section 8. Effect of Nonpayment of Assessments: Remedies of the Association. Any assessments which are not paid when due shall be delinquent. If the assessment is not paid within thirty (30) days after the due date, the assessment shall bear interest from the date of delinquency at the maximum legal rate per annum. In such case, the Association may accelerate, at its option, the entire unpaid balance of the assessment and may bring an action at law against the Owner personally obligated to pay the same, or foreclose the lien against such Owner's Lot, and interest, costs and reasonable attorney's fees of any such action shall be added to the amount of such assessment. Each such Owner, by his acceptance of a deed to a Lot, hereby expressly vests in the Association, or its agents, the right and power to bring all actions against such Owner personally for the collection of such charges as a debt and to enforce the aforesaid lien by all methods available for the enforcement of liens against real property. The lien provided for in this Section shall be in favor of the Association and shall be for the benefit of all other Owners. The Association, acting on behalf of the Owners, shall have the power to purchase any lot at any sale and convey the same for the purpose of protecting its lien. No owner may waive or otherwise escape liability for the assessments provided for herein by non-use of the Common Area, abandonment of his Lot or by renunciation of membership in the Association. An Owner may give to the Association, nevertheless, subject to acceptance thereof by the Association, a deed in lieu of action on lien.

Section 9. Subordination of the Lien to First Mortgages. The lien of the assessments provided for herein shall be subordinate to the lien of any first mortgage, first purchase money security deed or security deed representing a first lien on said property. Sale or transfer of any Lot shall not affect the assessment lien. However, the sale or transfer of any Lot pursuant to foreclosure or any proceeding in lieu thereof shall extinguish the lien of such assessments as to payments which became due prior to such sale or transfer. No sale or transfer shall relieve such Lot from liability for any assessments thereafter becoming due or from the lien thereof.

Section 10. Exempt Property. The following property subject to this Declaration shall be exempted from the assessments, charges and liens created herein: (a) all properties to the extent of any easement or other interest dedicated and accepted by the local public authority and devoted to public use; (b) all Common Area; and (c) all properties exempted from taxation by state or local governments upon the terms and to the extent of such legal exemption. Notwithstanding any provisions herein, no land or improvements devoted to dwelling use shall be exempt from said assessments, charges or liens except as set forth in Article V, Section 8, pertaining to the Developer.

MOORE & ROGERS
Attorneys At Law
Suite 109
192 Anderson Street
Marietta, Georgia 30060
(404) 429-1499

-7-

Section 11. Effect of Delinquency on Class B Members. Notwithstanding all of the foregoing rights of the Association, the Association shall have the further right to prohibit a delinquent Class B member, such delinquency being as hereinafter defined, from using in any manner the swimming pool, tennis courts and related facilities.

ARTICLE VI
MAINTENANCE

Section 1. Association's Responsibility. Except as otherwise provided for herein, the Association shall maintain and keep in good repair all portions of the Common Area and improvements thereon. The Association's responsibility with respect to the Common Area shall be deemed to include the maintenance, repair and replacement of (i) all roads, driveways, walks, parking areas and buildings and other improvements situated within the Common Area, (ii) such utility lines, pipes, plumbing, wires, conduits and systems which are a part of the Common Area, and (iii) all lawns, trees, shrubs, hedges, grass and other landscaping situated within or upon the Common Area.

ARTICLE VII
EASEMENTS

Section 1. Utility Easements. There is hereby created in favor of the Association an easement upon, across, over, through and under all of the Common Area for ingress, egress, installation, replacement, repair and maintenance of all utility and service lines and systems, including but not limited to water, sewers, gas, telephones, electricity, television cable or communication lines and systems. An easement is further granted to the Association, its officers, agents, employees and any management company retained by the Association, to enter in or to cross over the Common Area and the Lots, to inspect and to perform the duties of maintenance and repair of the Common Area and the Lots, as provided herein. Notwithstanding anything to the contrary contained in this Section, no sewers, electrical lines, water lines or other utilities may be installed or relocated on the Property except as initially programmed and approved by the Developer or thereafter approved by Developer or the Board. Should any utility furnishing a service covered by the general easement herein provided request a specific easement by a separate recordable document, Developer or the Association shall have the right to grant such easement on the Common Area without conflicting with the terms hereof.

Section 2. Easement for Developer. Developer hereby reserves for itself, its successors and assigns, the following easements and rights-of-way in, on, over, under and through any part of the Property owned by Developer and the Common Area for so long as Developer owns any Lot primarily for the purpose of sale:

    (a)  For the erection, installation, construction and maintenance of wires, lines and conduits, and necessary or proper attachments in connection with the transmission of electricity, gas, water, telephone, community antenna, television cables and other utilities;

    (b)  For the construction of improvements on the Lots;

MOORE & ROGERS
Attorneys At Law
Suite 108
100 Anderson Street
Marietta, Georgia 30060
(404) 428-1488

-8-

(c) For the installation, construction and maintenance of storm-water drains, public and private sewers, and for any other public or quasi-public utility facility;

(d) For the use of the Common Area and any sales offices, model units and parking spaces in connection with its efforts to market Lots;

(e) For the maintenance of such other facilities and equipment as in the sole discretion of Developer may be reasonably required, convenient or incidental to the completion, improvement and sale of Lots.

Section 3. Easements for Association. There shall be a general right and easement for the benefit of the Association, its directors, officers, agents and employees, including any management company retained by the Association, to enter upon the Common Area and the Lots to perform their respective duties.

### ARTICLE VIII
### GENERAL COVENANTS AND RESTRICTIONS

The following covenants and restrictions shall apply to all Lots and to all Structures erected or placed thereon:

Section 1. Residential Use. All Lots shall be restricted exclusively to single-family residential use; provided, however, that nothing herein shall be construed to prohibit or prevent Developer or any builder of residences in Dorsett from using any Lot owned by Developer or such builder for the purpose of carrying on business related to the development, improvement and sale of Lots and/or new homes in Chestnut Hill.

Section 2. Common Area. The Common Area shall be used by the Owners and their agents, servants, tenants, family members, invitees and licensees for such other purposes as may be authorized by the Association.

Section 3. Debris. No rubbish or debris of any kind shall be dumped, placed or permitted to accumulate upon any portion of an Owner's Lot so as to render the same unsanitary, unsightly or offensive. No nuisance shall be permitted to exist upon any portion of the Property.

Section 4. Erosion Control. No activity which may create erosion or siltation problems shall be undertaken on any Lot except for the initial construction of residences and development of the Property.

Section 5. Signs.

(a) No signs whatsoever shall be installed, altered or maintained on any Lot, or on any portion of a Structure visible from the exterior thereof, except:

(i) such signs as may be required by legal proceedings.

(ii) not more than one "For Sale" or "For Rent" sign, provided, however, that in no event shall any such sign be larger than six (6) square feet in area; and

MOORE & ROGERS
Attorneys At Law
Suite 100
100 Anderson Street
Marietta, Georgia 30060
(404) 429-1499

-9-

(iii) directional signs for vehicular or pedestrian safety;

(iv) entry signs used to identify subdivision, marketing signs used to advertise subdivision by Developer and in conjunction therewith brochure holders

(b) Following the consummation of the sale of any Lot, the sign located thereon shall be removed immediately.

Section 6. Fences. No chain link or cyclone fences may be placed on the Property.

Section 7. Recreational Vehicles, Trailers, etc. Recreational vehicles, trailers, campers, trucks (except pickups and vans), travel buses or any such equipment must be parked in extreme rear of property and sufficient natural cover erected to shield same from visibility. No inoperative vehicle shall be parked on any lot for any period of time in excess of fourteen (14) days. No owners or occupants of any lot or parcel of land shall repair or restore any vehicle of any kind upon any lot or upon any parcel of land, except for emergency repairs, and then only to the extent necessary to enable the movement thereof to a proper repair facility.

Section 8. Recreational Equipment. No recreational and playground equipment shall be placed or installed on any Lot which is visible from the street abutting such Lot.

Section 9. Accessory Structures. A detached accessory structure may be placed on a Lot to be used for a playhouse, a swimming pool, tennis court, a tool shed, a mailbox, a dog house or a garage; a garage may also be an attached accessory structure. Such accessory structures shall not exceed twenty (20) feet in height and shall conform in exterior design and quality to the dwelling on the same Lot. With the exception of a garage that is attached to a dwelling, an accessory structure placed on a Lot shall be located only behind the dwelling as such dwelling fronts on the street abutting such Lot. Such accessory structures shall also be located with such side and rear setback lines as may be required hereby or by applicable zoning law. However, there shall be no lighting for tennis courts or any other outside lighting except as may be approved by the Architectural Control Committee. Any such accessory structure must be approved, in advance, in writing by the Architectural Control Committee.

Section 10. Improvement of Lots. All construction of dwellings, accessory structures and all other improvements in Dorsett shall be undertaken and completed in accordance with the following conditions:

(a) All construction shall be carried out in compliance with the laws, code, rules, regulations and orders of all applicable governmental agencies and authorities.

(b) Concrete block or cinder block shall not be used as a building material for the exposed exterior surface of any dwelling or accessory structure constructed or placed on any Lot.

(c) Only one mailbox shall be located on any Lot, which mailbox shall be selected to be consistent with the quality and design of surrounding dwellings and mailboxes and shall be placed and maintained to complement the dwelling to which it is appurtenant to the extent such mailbox is permitted to be located and maintained by the United States Postal Service, its successors and assigns.

MOORE & ROGERS
Attorneys At Law
Suite 100
100 Anderson Street
Marietta, Georgia 30060
(404) 429-1499

-10-

(d)  No lumber, bricks, stones, cinder blocks, scaffolding, mechanical devices, or any other materials or devices used for building purposes shall be stored on any Lot except for purposes of construction of a dwelling of accessory structure on such Lot nor shall any such building materials or devices be stored on any Lot for longer than the length of time reasonably necessary for the construction in which such materials or devices are to be used.

(e)  No exposed above-ground tanks for the storage of fuel or water or any other substance shall be located on any Lot other than apparatus relating to solar energy, the location and design of which must first be approved by the Architectural Control Committee.

(f)  Adequate off-street parking shall be provided for each Lot.

(g)  All garages must have doors, and each garage door must be coordinated in design and color with the dwelling to which it is appurtenant.

(h)  Any construction on a Lot shall be at the risk of the Owner of such Lot and the Owner of such Lot shall be responsible for any damage to any curbing or street resulting from construction on such Lot; repairs of such damage must be made within thirty (30) days after completion of such construction.

(i)  The enclosed, heated living area (exclusive of garages, carports, porches, terraces, bulk-storage and basement) shall contain not less than two thousand (2,000) square feet. No dwelling shall be constructed exceeding three stories in height, including basement, on any Lot.

(j)  Exterior TV or radio receiving equipment shall not be permitted.

Section 11.  Animals.  No animals, including birds, insects and reptiles, may be kept on any Lot unless kept thereon solely as household pets and not for commercial purposes.  No animal shall be allowed to become a nuisance.

Section 12.  Accessory Structures Installed by Developer.  Entry signs, fences, walls and landscaping installed by Developer on the Property shall be and are hereby dedicated to the use and benefit of all owners, and shall not be removed or altered without a two-third (2/3) of the Association Class A members.

Section 13.  Miscellaneous Fixtures.  To provide a neat, attractive and harmonious appearance throughout the neighborhood, no awnings, shades or window boxes shall be attached to, or hung or used on the exterior of, any window or door of any house; and no railings, fences, walls, antenae or satellite dishes shall be installed or constructed upon any lot or parcel of land without the prior written consent of the Architectural Control Committee.  Further, no foil or other reflective materials shall be used on any windows or sunscreens, blinds, shades or for any other purpose, nor shall any window-mounted heating, air-conditioning or fan units be permitted.  Outside clotheslines or other outside facilities for drying or airing clothes are specifically prohibited and shall not be erected, placed or maintained upon any lot or parcel of land, nor shall any clothing, rugs or other items be hung on any railing, fence, hedge or wall.

MOORE & ROGERS
Attorneys At Law
Suite 108
190 Anderson Street
Marietta, Georgia 30060
(404) 429-1498

ARTICLE IX
GENERAL PROVISIONS

Section 1. _Enforcement_. (a) the Association, the Architectural Control Committee, the Developer or any Owner shall have the right to enforce, by an proceeding at law or in equity, all restrictions, conditions, covenants, reservations, easements, liens and charges now or hereafter imposed by the provisions of this Declaration. Failure by the Association or by any Owner to enforce any covenant or restriction herein contained shall in no event be deemed a waiver of the right to do so thereafter.

(b) The Architectural Control Committee shall have the right of abatement in all cases where an Owner of a Lot shall fail to take reasonable steps to remedy a violation or breach of any restriction contained in this Declaration within twenty (20) days after the mailing of written notice of such violation or breach. The right of abatement means the right of the Architectural Control Committee, through its agents and employees, to enter at all reasonable times upon any Lot or Structure as to which a violation or breach exists, and to take such action or actions specified in the notice to the Owner to abate, extinguish, remove or repair such violation or breach, all without being deemed to have committed a trespass or wrongful act by reason of such entry and such actions.

Section 2. _Severability_. If any provision of the Declaration, or any paragraph, subparagraph, article, section, sentence, clause, phrase, word or the application thereof in any circumstance, is held invalid, the validity of the remainder of this Declaration and the application of any such provision, paragraph, subparagraph, article, section, sentence, clause, phrase or word in any other circumstances shall not be affected thereby and the remainder of this Declaration shall be construed as if such invalid part was never included therein.

Section 3. _Headings_. The headings of articles and sections in this Declaration are for convenience of reference only and shall not in any way limit or define the content or substance of such articles and sections.

Section 4. _Duration_. The covenants and restrictions of this Declaration shall run with and bind the land for a period of twenty (20) years from the date this Declaration is recorded, at the end of which period such covenants and restrictions shall be automatically extended for successive periods of ten (10) years each, unless at least two-thirds (2/3) of the Owners at the time of the expiration of the initial period, or of any extension period, shall sign an instrument in which said covenants and restrictions are modified in whole or in part, which instrument is filed of record in the appropriate county.

Section 5. _Rights and Obligations_. Each grantee of the Developer and Owners, by the acceptance of a deed of conveyance, accepts the same subject to all restrictions, conditions, covenants, nants, reservations, liens and charges, and the jurisdiction, rights and powers created or reserved by this Declaration. All rights, benefits, privileges of every character hereby imposed shall be deemed and taken to be covenants running with the land and shall bind any person having at anytime any interest or estate in the Property or any portion thereof, and shall inure to the benefit of such grantee in like manner as though the provisions of this Declaration were recited and stipulated at length in each and every deed of conveyance or contract for conveyance.

MOORE & ROGERS
Attorneys At Law
Suite 109
112 Anderson Street
Marietta, Georgia 30060
(404) 429-1499

-12-

Section 6. <u>Notices</u>. Notices provided for in this Declaration shall be in writing and shall be addressed to any Owner at his Lot or at such other address as hereinafter provided. Notices to the Association or Board shall be in writing and shall be addressed to the President of the Association at his/her address which presently is:

> Post Office Box 70397
> Marietta, Georgia  30007

or at such different address or addresses as reflect their proper address. Any Owner may designate a different address for notices to him by giving written notice to the Association. Notices addressed as above shall be deemed delivered upon mailing by United States registered or certified mail or when delivered in person.

Section 7. <u>Amendment</u>. This Declaration may be amended unilaterally at any time and from time to time by Developer:

(i)   if such amendment is necessary to bring any provision hereof into compliance with any applicable governmental statute, rule or regulation or judicial determination which shall be in conflict therewith,

(ii)  if such amendment is necessary to enable any reputable title insurance company to issue title insurance coverage with respect to the Lots subject to this Declaration,

(iii) if such amendment is required to obtain the approval of this Declaration by an institutional lender, such as a bank, savings and loan association or life insurance company, or by a governmental lender or purchaser of mortgage loans, such as the Federal National Mortgage Association or Federal Home Loan Mortgage Corporation, to enable such lender or purchaser to make or purchase mortgage loans on the Lots subject to this Declaration, or

(iv)  if such amendment is necessary to enable any governmental agency, such as the Veterans Administration, or reputable private insurance company to insure mortgage loans on the Lots subject to this Declaration. Further, this Declaration may be amended at any time and from time to time by an agreement signed by at least seventy-five (75%) percent of the Owners of Lots; provided, however, such amendment by the Owners shall not be effective unless also signed by Developer, if Developer is the owner of any real property then subject to this Declaration. No amendment to the provisions of this Declaration shall alter, modify, change or rescind any right, title, interest or privilege herein granted or accorded to the holder of any mortgage encumbering any Lot or the Common Area affected thereby unless such holder shall consent in writing thereto. Any such amendment shall not become effective until the instrument evidencing such change has been filed of record. Every purchaser or grantee of any interest in any real property made subject to this Declaration, by acceptance of a deed or other conveyance therefor, thereby agrees that this Declaration may be amended as provided in this Section.

MOORE & ROGERS
Attorneys At Law
Suite 166
182 Anderson Street
Marietta, Georgia 30060
(404) 426-1486

-13-

(v)   Developer does hereby reserve the right, in its sole
discretion, to expand this Declaration to include
other real property by Developer's submission of such
real property to the rights, privileges and obliga-
tions contained herein.   Such submission shall be
evidenced by an amendment filed to this Declaration
setting forth therein the real property to which this
Declaration shall apply.   Upon which submission, said
real property shall be subject to and governed by this
declaration as if included herein ab initio.

        IN WITNESS WHEREOF, COTTON STATES PROPERTIES, LTD.
has caused this Declaration to be executed in its name and by
its duly authorized officers and its seal affixed on the day and
year first above written.

                            "DEVELOPER"

                            COTTON STATES PROPERTIES, LTD.

                            By: _____

                            Title: _____

                                        [CORPORATE SEAL]

Signed, sealed and delivered
in the presence of:

_____
Witness

_____
Notary Public

Notary Public, Georgia, State at Large
My Commission Expires 2-3-89

        [N.P. SEAL]

MOORE & ROGERS
Attorneys At Law
Suite 105
182 Anderson Street
Marietta, Georgia 30060
(404) 429-1495

                            -14-

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

PAUL SHIMEK, III, KATHY
FORBES, GEORGE FORBES,
MILDRED BOBBITT, and
JOHN ROSA,

      **Plaintiffs,**

v.

WEISSMAN, NOWACK, CURRY
& WILCO, P.C.,

      **Defendant.**

**CIVIL ACTION
FILE NO. 1:02 CV 3020**

## CERTIFICATE OF SERVICE

This will certify that I have this day served opposing counsel in the above-referenced matter with the foregoing DEFENDANT WEISSMAN, NOWACK, CURRY & WILCO, P.C.'S, MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO DISMISS, OR IN THE ALTERNATIVE, MOTION FOR SUMMARY JUDGMENT, AFFIDAVIT OF MARK MOORE, AND AFFIDAVIT OF JULIE HOWARD by placing a copy of same in the United States Mail with proper postage affixed thereon and addressed to:

> Robert Kaiden, Esq.
> Cristina Kaiden, Esq.
> 1850 Lake Park Drive
> Suite 204
> Smyrna, Georgia 30080

20

This _____92th_____ day of _____Dec_____, 2002.

_____
Edward M. Gilgor

Weissman, Nowack, Curry & Wilco
Two Midtown Plaza, 15th Floor
1349 West Peachtree Street
Atlanta, Georgia 30309
(404) 885-9215
(404) 885-9214 (Fax)

262414_1

21

After recording, please return to:

    Young & Young, P.C.
    181 Fourteenth Street, N.E.
    Second Floor
    Atlanta, Georgia  30309

# DECLARATION OF PROTECTIVE COVENANTS

## FOR

## CHEATHAM LAKES

YOUNG & YOUNG, P.C.
181 Fourteenth Street, N.E.
Second Floor
Atlanta, Georgia  30309
(404) 892-0237



EXHIBIT

7

94 OCT 17 AM 11: 20
COBB SUPERIOR COURT CLERK

BK 8536 PG 0189

- TABLE OF CONTENTS -

| Article | Section | Page |
|---------|---------|------|
| I. | DEFINITIONS | 1 |
| II. | PROPERTY SUBJECT TO THIS DECLARATION | 1 |
| | 1.  Property Hereby Subjected To This Declaration | 1 |
| | 2.  Other Property | 1 |
| III. | ASSOCIATION MEMBERSHIP AND VOTING RIGHTS | 2 |
| | 1.  Membership | 2 |
| | 2.  Voting | 2 |
| IV. | ASSESSMENTS | 2 |
| | 1.  Purpose of Assessment | 2 |
| | 2.  Creation of the Lien and Personal Obligation for Assessments | 2 |
| | 3.  Computation | 3 |
| | 4.  Special Assessments | 3 |
| | 5.  Lien for Assessments | 3 |
| | 6.  Effect of Nonpayment of Assessments: Remedies of the Association | 3 |
| | 7.  Date of Commencement of Assessments | 4 |
| | 8.  Specific Assessments | 4 |
| | 9.  Budget Deficits During Declarant Control | 4 |
| V. | MAINTENANCE; CONVEYANCE OF COMMON PROPERTY TO ASSOCIATION | 5 |
| | 1.  Association's Responsibility | 5 |
| | 2.  Owner's Responsibility | 5 |
| | 3.  Conveyance of Common Property by Declarant to Association | 5 |
| VI. | USE RESTRICTIONS AND RULES | 6 |
| | 1.  General | 6 |
| | 2.  Residential Use | 6 |
| | 3.  Architectural Standards | 6 |
| | 4.  Signs | 7 |
| | 5.  Vehicles | 7 |
| | 6.  Leasing | 8 |
| | 7.  Occupants Bound | 8 |
| | 8.  Animals and Pets | 8 |
| | 9.  Nuisance | 8 |
| | 10. Unsightly or Unkempt Conditions | 8 |
| | 11. Antennas | 9 |
| | 12. Tree Removal | 9 |
| | 13. Drainage | 9 |
| | 14. Sight Distance at Intersections | 9 |
| | 15. Garbage Cans, Etc. | 9 |
| | 16. Subdivision of Lot | 9 |
| | 17. Guns | 9 |
| | 18. Fences | 9 |
| | 19. Utility Lines | 10 |
| | 20. Air Conditioning Units | 10 |
| | 21. Lighting | 10 |
| | 22. Artificial Vegetation, Exterior Sculpture, and Similar Items | 10 |
| | 23. Energy Conservation Equipment | 10 |
| | 24. Swimming Pools | 10 |
| | 25. Gardens, Play Equipment and Pools | 10 |
| | 26. Mailboxes | 10 |

| Article | Section | | Page |
|---------|---------|---|------|
| | 27. Exteriors | | 10 |
| | 28. Clotheslines | | 10 |
| | 29. Exterior Security Devices | | 10 |
| | 30. Entry Features | | 10 |
| VII. | INSURANCE AND CASUALTY LOSSES | | 11 |
| | 1. Association Insurance | | 11 |
| | 2. Damage and Destruction -- Insured by Association | | 11 |
| | 3. Damage and Destruction -- Insured by Owners | | 12 |
| | 4. Insurance Deductible | | 12 |
| VIII. | CONDEMNATION | | 12 |
| IX. | ANNEXATION OF ADDITIONAL PROPERTY | | 12 |
| | 1. Unilateral Annexation By Declarant | | 12 |
| | 2. Other Annexation | | 13 |
| X. | MORTGAGEE PROVISIONS | | 13 |
| | 1. Notices of Action | | 13 |
| | 2. No Priority | | 13 |
| | 3. Notice to Association | | 14 |
| | 4. VA/HUD Approval | | 14 |
| | 5. Applicability of Article X | | 14 |
| | 6. Failure of Mortgagee to Respond | | 14 |
| | 7. Amendments by Board | | 14 |
| XI. | EASEMENTS | | 14 |
| | 1. Easements for Encroachment and Overhang | | 14 |
| | 2. Easements for Use and Enjoyment | | 14 |
| | 3. Easements for Utilities | | 15 |
| | 4. Easement for Entry | | 15 |
| | 5. Easement for Maintenance | | 15 |
| | 6. Easement for Entry Features | | 15 |
| | 7. Construction and Sale Period Easement | | 15 |
| XII. | GENERAL PROVISIONS | | 16 |
| | 1. Enforcement | | 16 |
| | 2. Self-Help | | 16 |
| | 3. Duration | | 17 |
| | 4. Amendment | | 17 |
| | 5. Gender and Grammar | | 18 |
| | 6. Severability | | 18 |
| | 7. Captions | | 18 |
| | 8. Indemnification | | 18 |
| | 9. Books and Records | | 18 |
| | 10. Financial Review | | 19 |
| | 11. Notice of Sale or Lease | | 19 |
| | 12. Agreements | | 19 |
| | 13. Implied Rights | | 19 |
| | 14. Variances | | 19 |
| | 15. Litigation | | 19 |

## -TABLE OF EXHIBITS-

| Exhibit | Name |
|---------|------|
| A | Definitions |
| B | Property Submitted |
| C | Additional Property Which May Unilaterally Be Submitted By Declarant |
| D | Bylaws of Cheatham Lakes Homeowners Association, Inc. |

# DECLARATION OF PROTECTIVE COVENANTS

## FOR

## CHEATHAM LAKES

THIS DECLARATION is made on the date hereinafter set forth by CHEATHAM LAKES AND ASSOCIATES, INC., a Georgia corporation (hereinafter sometimes called "Declarant").

### Background Statement

Declarant is the owner, or if not the owner has the consent of the owner, of the real property described in Article II, Section 1 of this Declaration.

Declarant desires to subject the real property described in Article II, Section 1 hereof to the provisions of this Declaration to create a residential community of single-family housing and to provide for the subjecting of other real property to the provisions of this Declaration.

NOW, THEREFORE, Declarant hereby declares that the real property described in Article II, Section 1 of this Declaration, including the improvements constructed or to be constructed thereon, is hereby subjected to the provisions of this Declaration and shall be held, sold, transferred, conveyed, used, occupied, and mortgaged or otherwise encumbered subject to the covenants, conditions, restrictions, easements, assessments, and liens hereinafter set forth, which are for the purpose of protecting the value and desirability of, and which shall run with the title to, the real property hereby or hereafter made subject hereto, and shall be binding on all persons or entities having any right, title, or interest in all or any portion of the real property now or hereafter made subject hereto, their respective heirs, legal representatives, successors, successors-in-title, and assigns and shall inure to the benefit of each and every owner of all or any portion thereof.

## Article I
## Definitions

Unless the context shall prohibit, certain words used in this Declaration shall be defined as set forth in Exhibit "A", attached hereto and by reference made a part hereof.

## Article II
## Property Subject To This Declaration

Section 1. **Property Hereby Subjected To This Declaration**. The real property which is, by the recording of this Declaration, subject to the covenants and restrictions hereafter set forth and which, by virtue of the recording of this Declaration, shall be held, transferred, sold, conveyed, used, occupied, and mortgaged or otherwise encumbered subject to this Declaration is the real property described in Exhibit "B", attached hereto and by reference made a part hereof.

Section 2. **Other Property**. Only the real property described in Section 1 of this Article II is hereby made subject to this Declaration; provided, however, by one or more Supplementary Declarations, Declarant and the Association have the right, but not the obligation, to subject other real property to this Declaration, as hereinafter provided.

THIS DECLARATION DOES NOT AND IS NOT INTENDED TO CREATE A CONDOMINIUM REGIME SUBJECT TO THE GEORGIA CONDOMINIUM ACT, O.C.G.A. SECTION 44-3-70, ET SEO.

.

## Article III
## Association Membership and Voting Rights

**Section 1.** **Membership.**  Every Person who is the record owner of a fee or undivided fee interest in any Lot that is subject to this Declaration shall be deemed to have a membership in the Association.  The foregoing is not intended to include Persons who hold an interest merely as security for the performance of an obligation, and the giving of a security interest shall not terminate the Owner's membership.  No Owner, whether one or more Persons, shall have more than one membership per Lot.  In the event of multiple Owners of a Lot, votes and rights of use and enjoyment shall be as provided in this Declaration and in the Bylaws.  Membership shall be appurtenant to and may not be separated from ownership of any Lot.  The rights and privileges of membership, including the right to vote and to hold office, may be exercised by a member or the member's spouse, but in no event shall more than one vote be cast for each Lot owned.

**Section 2.** **Voting.**  Members shall be entitled to one vote for each Lot owned.  When more than one Person holds an ownership interest in any Lot, the vote for such Lot shall be exercised as those Owners themselves determine and advise the Secretary prior to any meeting.  In the absence of such advice, the Lot's vote shall be suspended in the event more than one Person seeks to exercise it.

## Article IV
## Assessments

**Section 1.** **Purpose of Assessment.**  The assessments provided for herein shall be used for the general purposes of promoting the recreation, health, common benefit, and enjoyment of the Owners and Occupants of Lots, including the maintenance of real and personal property, all as may be more specifically authorized from time to time by the Board of Directors.

**Section 2.** **Creation of the Lien and Personal Obligation for Assessments.**  Each Owner of any Lot, by acceptance of a deed therefor, whether or not it shall be so expressed in such deed, covenants and agrees to pay to the Association (a) annual assessments or charges, (b) special assessments, such assessments to be established and collected as hereinafter provided, and (c) specific assessments against any particular Lot which are established pursuant to the terms of this Declaration, including, but not limited to, reasonable fines as may be imposed in accordance with the terms of this Declaration.  All such assessments, together with late charges, interest, not to exceed the maximum rate permitted by law or eighteen percent (18%) per annum on the principal amount due, and costs, including, without-limitation, reasonable attorney's fees actually incurred, shall be a charge on the land and shall be a continuing lien upon the Lot against which each assessment is made.  Each such assessment, together with late charges, interest, costs, including, without limitation, reasonable attorney's fees actually incurred, shall also be the personal obligation of the Person who was the Owner of such Lot at the time the assessment fell due.  Each Owner shall be personally liable for his or her portion of each assessment coming due while he or she is the Owner of a Lot, and his or her grantee shall be jointly and severally liable for such portion thereof as may be due and payable at the time of conveyance; provided, however, the liability of a grantee for the unpaid assessments of its grantor shall not apply to any first Mortgagee taking title through foreclosure proceedings or deed in lieu of foreclosure.

The Association shall, within five (5) days after receiving a written request therefor and for a reasonable charge, furnish a certificate signed by an officer of the Association setting forth whether the assessments on a specified Lot have been paid.  A properly executed certificate of the Association as to the status of assessments on a Lot shall be binding upon the Association as of the date of issuance.

2

Annual assessments shall be levied at a uniform rate per Lot and shall be paid in such manner and on such dates as may be fixed by the Board of Directors, which may include, without limitation, acceleration, upon ten (10) days' written notice, of the annual assessment for delinquents. Unless otherwise provided by the Board, the assessment shall be paid in annual installments.

Section 3.  **Computation**.  It shall be the duty of the Board to prepare a budget covering the estimated costs of operating the Association during the coming year, which may include, if necessary, a capital contribution or reserve in accordance with a capital budget separately prepared. The Board shall cause the assessments to be levied against each Lot for the following year to be delivered to each member at least thirty (30) days prior to the end of the current fiscal year (or at least thirty (30) days prior to the due date of the first installment in the case of the initial budget).  The budget and the assessment shall become effective unless disapproved at a meeting by a majority of the Total Association Vote. Notwithstanding the foregoing, however, in the event the membership disapproves the proposed budget or the Board fails for any reason so to determine the budget for the succeeding year, then and until such time as a budget shall have been determined, as provided herein, the budget in effect for the then current year shall continue for the succeeding year.

Section 4.  **Special Assessments**.  In addition to the other assessments authorized herein, the Association may levy special assessments in any year. Except as provided in Article VII, Section 2 hereof, any special assessment shall be effective only if approved by a majority of the Total Association Vote. Special assessments shall be paid as determined by the Board, and the Board may permit special assessments to be paid in installments extending beyond the fiscal year in which the special assessment is imposed.

Section 5.  **Lien for Assessments**.  All sums assessed against any Lot pursuant to this Declaration, together with late charges, interest, costs, including, without limitation, reasonable attorney's fees actually incurred, as provided herein, shall be secured by a lien on such Lot in favor of the Association and the Association shall be entitled to file such a lien in the land records of the county in which the Lot is located. Such lien shall be superior to all other liens and encumbrances on such Lot, except for (a) liens for ad valorem taxes and (b) liens for all sums unpaid on a first Mortgage or on any Mortgage to Declarant duly recorded in the land records of the county where the Community is located and all amounts advanced pursuant to such Mortgage and secured thereby in accordance with the terms of such instrument.

All other Persons acquiring liens or encumbrances on any Lot after this Declaration shall have been recorded in such records shall be deemed to consent that such liens or encumbrances shall be inferior to future liens for assessments, as provided herein, whether or not prior consent is specifically set forth in the instruments creating such liens or encumbrances.

Section 6.  **Effect of Nonpayment of Assessments:  Remedies of the Association**. Any assessments or installments thereof which are not paid when due shall be delinquent. Any assessment or installment thereof delinquent for a period of more than ten (10) days shall incur a late charge in an amount as the Board may from time to time determine. The Association shall cause a notice of delinquency to be given to any member who has not paid within ten (10) days following the due date. If the assessment is not paid within thirty (30) days, a lien, as herein provided, shall attach and, in addition, the lien shall include interest, not to exceed the lesser of the maximum rate permitted by law or eighteen percent (18%) per annum on the principal amount due from the date first due and payable, all late charges, all costs of collection, including, without limitation, reasonable attorney's fees actually incurred, and any other amounts provided or permitted by law. In the event that the assessment remains unpaid after sixty (60) days, the Association may, as the Board shall determine, institute suit to collect such amounts and/or to foreclose its lien. Each Owner,

3

by acceptance of a deed or as a party to any other type of a conveyance, vests in the Association or its agents the right and power to bring all actions against such Owner personally for the collection of such charges as a debt or to foreclose the aforesaid lien in the same manner as other liens for the improvement of real property. The lien provided for in this Article shall be in favor of the Association and shall be for the benefit of all other Owners. The Association, acting on behalf of the Owners, shall have the power to bid on the Lot at any foreclosure sale or to acquire, hold, lease, mortgage, or convey the same.

No Owner may waive or otherwise exempt himself or herself from liability for the assessments provided for herein, including, by way of illustration, but not limitation, abandonment of the Lot. No diminution or abatement of any assessment shall be claimed or allowed by reason of any alleged failure of the Association to take some action or perform some function required to be taken or performed by the Association under this Declaration or the Bylaws, or for inconvenience or discomfort arising from the making of repairs or improvements which are the responsibility of the Association, or from any action taken by the Association to comply with any law, ordinance, or with any order or directive of any municipal or other governmental authority, the obligation to pay assessments being a separate and independent covenant on the part of each Owner.

All payments shall be applied first to costs, then to late charges, then to interest and then to delinquent assessments.

**Section 7.   Date of Commencement of Assessments**. The assessments provided for herein shall commence as to a Lot subject to this Declaration on the first day of the month following the conveyance of such Lot to a Person who has not purchased such Lot for the purpose of construction of a residence and resale of such Lot and residence. Lots which have not been so conveyed shall not be subject to assessment. Assessments shall be due and payable in a manner and on a schedule as the Board of Directors may provide. The first annual assessment shall be adjusted according to the number of months then remaining in that fiscal year.

**Section 8.   Specific Assessments**. The Board shall have the power to specifically assess pursuant to this Section as, in its discretion, it shall deem appropriate. Failure of the Board to exercise its authority under this Section shall not be grounds for any action against the Association or the Board of Directors and shall not constitute a waiver of the Board's right to exercise its authority under this Section in the future with respect to any expenses, including an expense for which the Board has not previously exercised its authority under this Section. Fines levied pursuant to Article XII, Section 1 of this Declaration and the costs of maintenance performed by the Association which the Owner is responsible for under Article V, Sections 1 and 2 of this Declaration shall be specific assessments. The Board may also specifically assess Owners for the following Association expenses:

(a) Expenses of the Association which benefit less than all of the Lots may be specifically assessed equitably among all of the Lots which are benefitted according to the benefit received.

(b) Expenses of the Association which benefit all Lots, but which do not provide an equal benefit to all Lots, may be assessed equitably among all Lots according to the benefit received.

**Section 9.   Budget Deficits During Declarant Control**. For so long as the Declarant has the authority to appoint the directors and officers of the Association, Declarant may (a) advance funds to the Association sufficient to satisfy the deficit, if any, between the actual operating expenses of the Association (but specifically not including an allocation for capital reserves) and the sum of the annual, special and specific assessments collected by the

4

Association in any fiscal year, and such advances shall be evidenced by promissory notes from the Association in favor of the Declarant or (b) cause the Association to borrow such amount from a commercial lending institution at the then prevailing rates for such a loan in the local area of the Community. The Declarant in its sole discretion may guarantee repayment of such loan, if required by the lending institution, but no Mortgage secured by the Common Property or any of the improvements maintained by the Association shall be given in connection with such loan.

### Article V
### Maintenance; Conveyance of Common Property to Association

**Section 1.** **Association's Responsibility.** The Association shall maintain and keep in good repair the Common Property. This maintenance shall include, without limitation, maintenance, repair, and replacement, subject to any insurance then in effect, of all landscaping and improvements situated on the Common Property. The Association shall also maintain (a) all entry features for the Community, including the expenses for water and electricity, if any, provided to all such entry features, (b) landscaping originally installed by the Declarant whether or not such landscaping is on a Lot or public right-of-way, (c) all drainage and detention areas which were originally maintained by the Declarant, to the extent such areas are not maintained on an ongoing basis by a local governmental entity, (d) all property outside of Lots located within the Community which was originally maintained by Declarant, and (e) all specialty street signs originally installed by the Declarant whether or not such street signs are on a Lot or public right-of-way.

In addition, the Association shall have the right, but not the obligation, to maintain other property not owned by the Association, whether within or without the Community, where the Board has determined that such maintenance would benefit all Owners.

In the event that the Association determines that the need for maintenance, repair, or replacement which is the responsibility of the Association hereunder is caused through the willful or negligent act of an Owner, or the family, guests, lessees, or invitees of any Owner, and is not covered and paid for by insurance, in whole or in part, then the Association may perform such maintenance, repair or replacement at such Owner's sole cost and expense, and all costs thereof shall be added to and become a part of the assessment to which such Owner is subject and shall become a lien against the Lot of such Owner.

The foregoing maintenance shall be performed consistent with the Community-Wide Standard.

**Section 2.** **Owner's Responsibility.** Except as provided in Section 1 above, all maintenance of the Lot and all structures, parking areas, landscaping, and other improvements thereon shall be the sole responsibility of the Owner thereof, who shall maintain such Lot in a manner consistent with the Community-Wide Standard and this Declaration. In the event that the Board of Directors of the Association determines that any Owner has failed or refused to discharge properly any of such Owner's obligations with regard to the maintenance, repair, or replacement of items for which such Owner is responsible hereunder, the Association shall, except in an emergency situation, give the Owner written notice of the Association's intent to provide such necessary maintenance, repair, or replacement at the Owner's sole cost and expense. The notice shall set forth with reasonable particularity the maintenance, repairs, or replacement deemed necessary. The Owner shall have ten (10) days after receipt of such notice within which to complete such maintenance, repair, or replacement, or, in the event that such maintenance, repair, or replacement is not capable of completion within a ten (10) day period, to commence such work which shall be completed within a reasonable time. If any Owner does not comply with the provisions

5

hereof, the Association may provide any such maintenance, repair, or replacement at such Owner's sole cost and expense, and all costs shall be added to and become a part of the assessment to which such Owner is subject and shall become a lien against the Lot.

**Section 3.  Conveyance of Common Property by Declarant to Association.**  The Declarant may transfer or convey to the Association any personal property and any improved or unimproved real property, leasehold, easement, or other property interest.  Such conveyance shall be accepted by the Association, and the property shall thereafter be Common Property to be maintained by the Association for the benefit of all or a part of its members. Declarant shall not be required to make any improvements whatsoever to property to be conveyed and accepted pursuant to this Section.

**Article VI**
**Use Restrictions and Rules**

**Section 1.  General.**  This Article, beginning at Section 2, sets out certain use restrictions which must be complied with by all Owners and Occupants. These use restrictions may only be amended in the manner provided in Article XII, Section 4, hereof regarding amendment of this Declaration.  In addition, the Board may, from time to time, without consent of the members, promulgate, modify, or delete other use restrictions and rules and regulations applicable to the Community.  Such use restrictions and rules shall be distributed to all Owners and Occupants prior to the date that they are to become effective and shall thereafter be binding upon all Owners and Occupants until and unless overruled, cancelled, or modified in a regular or special meeting by a majority of the Total Association Vote.

**Section 2.  Residential Use.**  All Lots shall be used for residential purposes exclusively.  No business or business activity shall be carried on in or upon any Lot at any time unless the conduct of such business or business activity, in the sole discretion of the Board, is not visible from streets or property neighboring such Lot, does not otherwise violate the provisions of the Declaration or Bylaws, does not create a disturbance, and does not unduly increase traffic flow or parking congestion.  Leasing of a Lot shall not be considered a business or business activity.

**Section 3.  Architectural Standards.**  No exterior construction, alteration, addition, or erection of any nature whatsoever shall be commenced or placed upon any part of the Community, except such as is installed by the Declarant, or as is approved in accordance with this Section, or as is otherwise expressly permitted herein.  No exterior construction, addition, erection, or alteration shall be made unless and until plans and specifications showing at least the nature, kind, shape, height, materials, and location shall have been submitted in writing to and approved by an Architectural Review Committee ("ARC").  The ARC may be established such that it is divided into two subcommittees, with one subcommittee having jurisdiction over modifications and the other having jurisdiction over new construction. The Board may employ architects, engineers, or other Persons as it deems necessary to enable the ARC to perform its review. The ARC may, from time to time, delegate any of its rights or responsibilities hereunder to one or more duly licensed architects or other qualified Persons, which shall have full authority to act on behalf of the committee for all matters delegated.  Written design guidelines and procedures may be promulgated for the exercise of this review, which guidelines may provide for a review fee.  So long as the Declarant owns any property for development and/or sale in the Community or has the right unilaterally to annex additional property to the Community, the Declarant shall have the right to appoint all members of the ARC.  Upon the expiration or earlier surrender in writing of such right, the Board shall appoint the members of the ARC.

6

If the ARC fails to approve or to disapprove submitted plans and specifications within sixty (60) days after the plans and specifications have been submitted to it, the foregoing will be deemed approved. However, all activities commenced pursuant to plans which have been deemed approved shall be consistent with such plans.

As a condition of approval under this Section, each Owner, on behalf of such Owner and such Owner's successors-in-interest, shall assume all responsibilities for maintenance, repair, replacement, and insurance to and on any change, modification, addition, or alteration. In the discretion of the ARC, an Owner may be made to verify such condition of approval by a recordable written instrument acknowledged by such Owner on behalf of such Owner and such Owner's successors-in-interest. The ARC shall be the sole arbiter of such plans and may withhold approval for any reason, including purely aesthetic considerations, and it shall be entitled to stop any construction in violation of these restrictions. Any member of the Board or its representatives shall have the right, during reasonable hours and after reasonable notice, to enter upon any property to inspect for the purpose of ascertaining whether or not these restrictive covenants have been or are being complied with. Such Person or Persons shall not be deemed guilty of trespass by reason of such entry. In addition to any other remedies available to the Association, in the event of noncompliance with this Section, the Board may, as provided in Article XII, Section 1 hereof, record in the appropriate land records a notice of violation naming the violating Owner.

PLANS AND SPECIFICATIONS ARE NOT APPROVED FOR ENGINEERING OR STRUCTURAL DESIGN OR QUALITY OF MATERIALS, AND BY APPROVING SUCH PLANS AND SPECIFICATIONS NEITHER THE ARC, THE MEMBERS THEREOF, NOR THE ASSOCIATION ASSUMES LIABILITY OR RESPONSIBILITY THEREFOR, NOR FOR ANY DEFECT IN ANY STRUCTURE CONSTRUCTED FROM SUCH PLANS AND SPECIFICATIONS. NEITHER DECLARANT, THE ASSOCIATION, THE ARC, THE BOARD, NOR THE OFFICERS, DIRECTORS, MEMBERS, EMPLOYEES, AND AGENTS OF ANY OF THEM SHALL BE LIABLE IN DAMAGES TO ANYONE SUBMITTING PLANS AND SPECIFICATIONS TO ANY OF THEM FOR APPROVAL, OR TO ANY OWNER OF PROPERTY AFFECTED BY THESE RESTRICTIONS BY REASON OF MISTAKE IN JUDGMENT, NEGLIGENCE, OR NONFEASANCE ARISING OUT OF OR IN CONNECTION WITH THE APPROVAL OR DISAPPROVAL OR FAILURE TO APPROVE OR DISAPPROVE ANY SUCH PLANS OR SPECIFICATIONS. EVERY PERSON WHO SUBMITS PLANS OR SPECIFICATIONS AND EVERY OWNER AGREES THAT SUCH PERSON OR OWNER WILL NOT BRING ANY ACTION OR SUIT AGAINST DECLARANT, THE ASSOCIATION, THE ARC, THE BOARD, OR THE OFFICERS, DIRECTORS, MEMBERS, EMPLOYEES, AND AGENTS OF ANY OF THEM TO RECOVER ANY DAMAGES AND HEREBY RELEASES, REMISES, QUITCLAIMS, AND COVENANTS NOT TO SUE FOR ALL CLAIMS, DEMANDS, AND CAUSES OF ACTION ARISING OUT OF OR IN CONNECTION WITH ANY JUDGMENT, NEGLIGENCE, OR NONFEASANCE AND HEREBY WAIVES THE PROVISIONS OF ANY LAW WHICH PROVIDES THAT A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS, DEMANDS, AND CAUSES OF ACTION NOT KNOWN AT THE TIME THE RELEASE IS GIVEN.

Section 4.   Signs.   No sign of any kind shall be erected by an Owner or Occupant within the Community without the prior written consent of the ARC except (a) not more than one (1) "For Sale" and "For Rent" sign consistent with the Community-Wide Standard and having a maximum area of four (4) square feet, (b) security signs consistent with the Community-Wide Standard, (c) any signs required by legal proceedings, and (d) signs erected by Declarant. Notwithstanding the foregoing, the Board shall have the right to erect reasonable and appropriate signs.

Section 5.   Vehicles.   The term "vehicles," as used herein, shall include, without limitation, motor homes, boats, trailers, motorcycles, minibikes, scooters, go-carts, trucks, campers, buses, vans, and automobiles.   Vehicles shall not be parked on any street within the Community or on any portion of a Lot other than in the garage; provided, however, if, and only if, the Occupants of a Lot have more vehicles than the number of garage parking spaces, such excess vehicles may be parked on the driveway on the Lot.

7

No vehicle may be left upon any portion of the Community, except in a garage, for a period longer than three (3) days if it is unlicensed or if it is in a condition such that it is incapable of being operated upon the public highways. After such three (3) day period, such vehicle shall be considered a nuisance and may be removed from the Community. Any towed vehicle, boat, recreational vehicle, motor home, or mobile home regularly stored in the Community or temporarily kept in the Community, except if kept in a garage or other area designated by the ARC, for periods longer than twenty-four (24) continuous hours each shall be considered a nuisance and may be removed from the Community.

**Section 6. Leasing.** Lots may be leased for residential purposes. All leases shall require, without limitation, that the tenant acknowledge receipt of a copy of the Declaration, Bylaws, use restrictions, and rules and regulations of the Association. The lease shall also obligate the tenant to comply with the foregoing.

**Section 7. Occupants Bound.** All provisions of the Declaration and Bylaws, and of any rules and regulations, use restrictions, or design guidelines promulgated pursuant thereto which govern the conduct of Owners and which provide for sanctions against Owners, shall also apply to all Occupants even though Occupants are not specifically mentioned. Fines may be levied against Owners or Occupants. If a fine is first levied against an Occupant and is not paid timely, the fine may then be levied against the Owner.

**Section 8. Animals and Pets.** No animals, livestock, or poultry of any kind may be raised, bred, kept, or permitted on any Lot, with the exception of dogs, cats, or other usual and common household pets in reasonable number, as determined by the Board; provided, however, those pets which are permitted to roam free, or, in the sole discretion of the Board, endanger the health, make objectionable noise, or constitute a nuisance or inconvenience to the owners of other Lots or the owner of any property located adjacent to the Community may be removed by the Board. No pets shall be kept, bred or maintained for any commercial purpose. Dogs which are household pets shall at all times whenever they are outside a Lot be confined on a leash. Without prejudice to the Board's right to remove any such household pets, no household pet that has caused damage or injury may be walked in the Community.

**Section 9. Nuisance.** It shall be the responsibility of each Owner and Occupant to prevent the development of any unclean, unhealthy, unsightly, or unkempt condition on such Owner's Lot. No property within the Community shall be used, in whole or in part, for the storage of any property or thing that will cause such Lot to appear to be in an unclean or untidy condition or that will be obnoxious to the eye; nor shall any substance, thing, or material be kept that will emit foul or obnoxious odors or that will cause any noise or other condition that will or might disturb the peace, quiet, safety, comfort, or serenity of the occupants of surrounding property. No noxious or offensive activity shall be carried on within the Community, nor shall anything be done tending to cause embarrassment, discomfort, annoyance, or nuisance to any Person using any property within the Community. There shall not be maintained any plants or animals or device or thing of any sort whose activities or existence in any way is noxious, dangerous, unsightly, unpleasant, or of a nature as may diminish or destroy the enjoyment of the Community. Without limiting the generality of the foregoing, no speaker, horn, whistle, siren, bell, amplifier or other sound device, except such devices as may be used exclusively for security purposes, shall be located, installed or maintained upon the exterior of any Lot unless required by law.

**Section 10. Unsightly or Unkempt Conditions.** The pursuit of hobbies or other activities, including specifically, without limiting the generality of the foregoing, the assembly and disassembly of motor vehicles and other mechanical devices, which might tend to cause disorderly, unsightly, or unkempt conditions shall not be pursued or undertaken in any part of the Community.

8

**Section 19.** **Utility Lines.** Except as may be permitted by the ARC, no overhead utility lines, including lines for cable television, shall be permitted within the Community, except for temporary lines as required during construction and lines installed by or at the request of Declarant.

**Section 20.** **Air-Conditioning Units.** Except as may be permitted by the ARC, no window air conditioning units may be installed.

**Section 21.** **Lighting.** Except as may be permitted by the ARC, exterior lighting visible from the street shall not be permitted except for (a) approved lighting as originally installed on a Lot, (b) one (1) decorative post light, (c) street lights in conformity with an established street lighting program for the Community, (d) seasonal decorative lights, (e) front house illumination of model homes, (f) decorative accent lighting, and (g) security lights affixed to the house.

**Section 22.** **Artificial Vegetation, Exterior Sculpture, and Similar Items.** No artificial vegetation shall be permitted on the exterior of any property. Exterior sculpture, fountains, flags, and similar items must be approved by the ARC; provided, however, the display of flags for generally recognized holidays on which flags are customarily displayed shall be permitted for a period from one (1) week prior to the date of such holiday until one (1) week after the date of such holiday.

**Section 23.** **Energy Conservation Equipment.** No solar energy collector panels or attendant hardware or other energy conservation equipment shall be constructed or installed unless they are an integral and harmonious part of the architectural design of a structure, as determined in the sole discretion of the ARC.

**Section 24.** **Swimming Pools.** No swimming pool shall be constructed, erected or maintained upon any Lot without the prior written consent of the ARC and in no event shall any above-ground swimming pool be permitted.

**Section 25.** **Gardens, Play Equipment and Pools.** No vegetable garden, hammock, statuary, play equipment, or pool which has received the approval of the ARC, if required by this Declaration, and is to be erected on any Lot may be located other than between the rear dwelling line and the rear Lot line, without the prior written consent of the ARC. This provision shall not, however, apply to basketball goals.

**Section 26.** **Mailboxes.** All mailboxes shall be black and shall be mounted on a natural wood mailbox post.

**Section 27.** **Exteriors.** Any change to the exterior color of any improvement located on a Lot, including, without limitation, the dwelling or any fence located on a Lot, must be approved by the ARC.

**Section 28.** **Clotheslines.** No exterior clotheslines of any type shall be permitted upon any Lot.

**Section 29.** **Exterior Security Devices.** No exterior security devices, including, without limitation, window bars, shall be permitted on any residence or Lot. Signs placed on the Lot or the exterior of the residence stating that such residence is protected by a security system shall not be deemed to constitute an exterior security device.

**Section 30.** **Entry Features.** Owners shall not alter, remove or add improvements to any entry features constructed by the Declarant on any Lot, or any part of any easement area associated therewith, without the prior written consent of the ARC.

## Article VII
### Insurance and Casualty Losses

**Section 1.   Association Insurance.**   The Board of Directors or the duly authorized agent of the Association shall have the authority to and shall obtain or cause to be obtained insurance for all insurable improvements, whether or not located on the Common Property, which the Association is obligated to maintain. This insurance shall provide, at a minimum, fire and extended coverage, including vandalism and malicious mischief, and shall be in an amount sufficient to cover the full replacement cost of any repair or reconstruction in the event of damage or destruction from any such hazard.   Alternatively, the Board may purchase "all-risk" coverage in like amounts.

The Board also shall obtain a public liability policy covering the Association and its members for all damage or injury caused by the negligence of the Association or any of its members or agents, and, if reasonably available, directors' and officers' liability insurance.   The public liability policy shall have a combined single limit of at least One Million Dollars ($1,000,000.00).

In addition to the other insurance required by this Section, the Board shall obtain worker's compensation insurance, if and to the extent necessary to satisfy the requirements of applicable laws, and a fidelity bond or bonds on directors, officers, employees, and other persons handling or responsible for the Association's funds, if reasonably available.   If obtained, the amount of fidelity coverage shall be determined in the directors' best business judgment, and, if available, shall at least equal three months' assessments plus reserves on hand.   Bonds shall contain a waiver of all defenses based upon the exclusion of persons serving without compensation and may not be cancelled, subjected to nonrenewal or substantially modified without at least thirty (30) days' prior written notice to the Association.   The Association shall also obtain construction code endorsements, steam boiler coverage, and flood insurance, if and to the extent necessary to satisfy the requirements of the Federal Home Loan Mortgage Corporation, the Federal National Mortgage Association, the U.S. Department of Veterans Affairs ("VA"), or the U.S. Department of Housing and Urban Development ("HUD").

Premiums for all insurance shall be common expenses of the Association. The policies may contain a reasonable deductible, and the amount thereof shall not be subtracted from the face amount of the policy in determining whether the insurance at least equals the full replacement cost.

All such insurance coverage obtained by the Board of Directors shall be written in the name of the Association with the proceeds payable to the Association, and exclusive authority to adjust losses under policies obtained by the Association shall be vested in the Association's Board of Directors; provided, however, no Mortgagee having an interest in such losses may be prohibited from participating in the settlement negotiations, if any, related thereto.

All insurance policies shall be reviewed at least annually by the Board and one or more other qualified persons, at least one of whom must be in the real estate industry and familiar with construction in the county where the Community is located, in order to ascertain whether the coverage contained in the policies is sufficient to make any necessary repairs or replacement of property which may be damaged or destroyed or to cover adequately the hazards or liabilities insured against.

**Section 2.   Damage and Destruction -- Insured by Association.**   Any damage or destruction to property covered by insurance written in the name of the Association shall be repaired or reconstructed unless, within ninety (90) days after the casualty, at least seventy-five percent (75%) of the Total Association Vote otherwise agree.   No Mortgagee shall have the right to participate in the

11

determination of whether damage or destruction shall be repaired or reconstructed. If the damage or destruction for which the insurance proceeds are paid is to be repaired or reconstructed and such proceeds are not sufficient to defray the cost thereof, the Board of Directors shall, without the necessity of a vote of the Association's members, levy a special assessment against all Owners in proportion to the number of Lots owned by such Owners. Additional assessments may be made in like manner at any time during or following the completion of any repair or reconstruction. If the funds available from insurance exceed the costs of repair or reconstruction or if the improvements are not repaired or reconstructed, such funds or excess shall be deposited to the benefit of the Association.

**Section 3.** **Damage and Destruction -- Insured by Owners.** The damage or destruction by fire or other casualty to all or any portion of any improvement on a Lot shall be repaired by the Owner thereof within seventy-five (75) days after such damage or destruction or, where repairs cannot be completed within seventy-five (75) days, they shall be commenced within such period and shall be completed within a reasonable time thereafter. Alternatively, the Owner may elect to demolish all improvements on the Lot and remove all debris therefrom within seventy-five (75) days after such damage or destruction. In the event of noncompliance with this provision, the Board of Directors shall have all enforcement powers specified in Article XII, Section 1 of this Declaration.

**Section 4.** **Insurance Deductible.** The deductible for any casualty insurance policy carried by the Association shall, in the event of damage or destruction, be allocated among the Persons who are responsible hereunder, or under any declaration or contract requiring the Association to obtain such insurance, for maintenance of the damaged or destroyed property.

## Article VIII
### Condemnation

In the event of a taking by eminent domain of any portion of the Common Property on which improvements have been constructed, then, unless within sixty (60) days after such taking, at least seventy-five percent (75%) of the Total Association Vote shall otherwise agree, the Association shall restore or replace such improvements so taken on the remaining land included in the Common Property to the extent lands are available therefor. The provisions of Article VII, Section 3 above, applicable to Common Property improvements damage, shall govern replacement or restoration and the actions to be taken in the event that the improvements are not restored or replaced.

## Article IX
### Annexation of Additional Property

#### Section 1.   Unilateral Annexation By Declarant.

(a)  As the owner thereof or, if not the owner, with the consent of the owner thereof, Declarant shall have the unilateral right, privilege, and option from time to time at any time until five (5) years after the recording of this Declaration to subject all or any portion of the real property described in Exhibit "C", attached hereto and by reference made a part hereof to the provisions of this Declaration and the jurisdiction of the Association by filing for record in the county in which the property to be annexed is located a Supplementary Declaration describing the property being subjected.  Any such annexation shall be effective upon the filing for record of such Supplementary Declaration unless otherwise provided therein.  As long as covenants applicable to the real property previously subjected to this Declaration are not changed and as long as rights of existing Owners are not adversely affected, the Declarant may unilaterally amend this Declaration to reflect the different character of any such annexed real property.

12

(b)  The rights reserved unto Declarant to subject additional land to the Declaration shall not impose any obligation upon Declarant to subject any of such additional land to this Declaration or to the jurisdiction of the Association. If such additional land is not subjected to this Declaration, Declarant's reserved rights shall not impose any obligation on Declarant to impose any covenants and restrictions similar to those contained herein upon such additional land nor shall such rights in any manner limit or restrict the use to which such additional land may be put by Declarant or any subsequent owner thereof, whether such uses are consistent with the covenants and restrictions imposed hereby or not.

Section 2.   Other Annexation.   Subject to the consent of the owner(s) thereof and the consent of the Declarant (so long as the Declarant owns any property for development and/or sale in the Community), upon the affirmative vote or written consent, or any combination thereof, of the Owners of at least two-thirds (2/3) of the Lots (other than Lots owned by Declarant so long as the consent of Declarant is required), the Association may annex real property to the provisions of this Declaration and the jurisdiction of the Association by filing for record in the county in which the property to be annexed is located a Supplementary Declaration describing the property being annexed.   Any such Supplementary Declaration shall be signed by the President of the Association whose signature shall be attested by the Secretary of the Association, and any such annexation shall be effective only upon the filing for record of such Supplementary Declaration, unless a later effective date is provided therein.

## Article X
## Mortgagee Provisions

The following provisions are for the benefit of holders of first Mortgages on Lots in the Community.   The provisions of this Article apply to both this Declaration and to the Bylaws, notwithstanding any other provisions contained therein.

Section 1.   Notices of Action.   An institutional holder, insurer, or guarantor of a first Mortgage, who provides a written request to the Association (such request to state the name and address of such holder, insurer, or guarantor and the Lot number, therefore becoming an "eligible holder"), will be entitled to timely written notice of:

(a)  any condemnation loss or any casualty loss which affects a material portion of the Community or which affects any Lot on which there is a first Mortgage held, insured, or guaranteed by such eligible holder;

(b)  any delinquency in the payment of assessments or charges owed by an Owner of a Lot subject to the Mortgage of such eligible holder, where such delinquency has continued for a period of sixty (60) days; provided, however, notwithstanding this provision, any holder of a first Mortgage, upon request, is entitled to written notice from the Association of any default in the performance by the Owner of the encumbered Lot of any obligation under the Declaration or Bylaws of the Association which is not cured within sixty (60) days;

(c)  any lapse, cancellation, or material modification of any insurance policy maintained by the Association; or

(d)  any proposed action which would require the consent of a specified percentage of Mortgage holders.

Section 2.   No Priority.   No provision of this Declaration or the Bylaws gives or shall be construed as giving any Owner or other party priority over any rights of the first Mortgagee of any Lot in the case of distribution to such

13

Owner of insurance proceeds or condemnation awards for losses to or a taking of the Common Property.

**Section 3.  Notice to Association.**  Upon request, each Lot Owner shall be obligated to furnish to the Association the name and address of the holder of any Mortgage encumbering such Owner's Lot.

**Section 4.  VA/HUD Approval.**  As long as the Declarant has the right to appoint and remove the directors of the Association, the following actions shall require the prior approval of the VA so long as the VA is guaranteeing any Mortgage in the Community, and HUD so long as HUD is insuring any Mortgage in the Community:  annexation of additional property to the Community, except for annexation by Declarant in accordance with Article IX, Section 1 hereof pursuant to a plan of annexation previously approved by the VA and/or HUD, as applicable; mortgaging of Common Property; dedication of Common Property to any public entity; mergers and consolidations; dissolution of the Association; and material amendment of the Declaration, Bylaws, or Articles of Incorporation of the Association.

**Section 5.  Applicability of Article X.**  Nothing contained in this Article shall be construed to reduce the percentage vote that must otherwise be obtained under the Declaration, Bylaws, or Georgia law for any of the acts set out in this Article.

**Section 6.  Failure of Mortgagee to Respond.**  Any Mortgagee who receives a written request from the Board to respond to or consent to any action shall be deemed to have approved such action if the Association does not receive a written response from the Mortgagee within thirty (30) days of the date of the Association's request.

**Section 7.  Amendments by Board.**  Should the Federal National Mortgage Association, the Federal Home Loan Mortgage Corporation, HUD or VA subsequently delete any of their respective requirements which necessitate the provisions of this Article or make any such requirements less stringent, the Board, without approval of the Owners, may cause an amendment to this Article to be recorded to reflect such changes.

## Article XI
## Easements

**Section 1.  Easements for Encroachment and Overhang.**  There shall be reciprocal appurtenant easements for encroachment and overhang as between each Lot and such portion or portions of the Common Property adjacent thereto or as between adjacent Lots due to the unintentional placement or settling or shifting of the improvements constructed, reconstructed, or altered thereon (in accordance with the terms of this Declaration) to a distance of not more than five (5) feet, as measured from any point on the common boundary between each Lot and the adjacent portion of the Common Property or as between adjacent Lots, as the case may be, along a line perpendicular to such boundary at such point; provided, however, in no event shall an easement for encroachment exist if such encroachment occurred due to willful conduct on the part of an Owner, tenant, or the Association.

**Section 2.  Easements for Use and Enjoyment.**  To the extent there is any Common Property, every Owner of a Lot shall have a right and easement of ingress and egress, use and enjoyment in and to such Common Property which shall be appurtenant to and shall pass with the title to each Lot, subject to the following provisions:

(a)  the right of the Association to dedicate or grant licenses, permits or easements over, under and through the Common Property to governmental entities for public purposes; and

14

BK 8536 PG 0206

(b)   the right of the Association to dedicate or transfer all or any portion of the Common Property subject to such conditions as may be agreed to by the members of the Association.   No such dedication or transfer shall be effective unless an instrument agreeing to such dedication or transfer has been approved by the affirmative vote of at least two-thirds (2/3) of the Lots (other than Lots of Declarant so long as the consent of Declarant is required) and the consent of Declarant (so long as Declarant owns any property for development and/or sale in the Community or has the right unilaterally to annex additional property to the Community).

Section 3.   **Easements for Utilities**.   There is hereby reserved to the Declarant and the Association blanket easements upon, across, above and under all property within the Community for access, ingress, egress, installation, repairing, replacing, and maintaining all utilities serving the Community or any portion thereof, including, but not limited to, gas, water, sanitary sewer, telephone and electricity, as well as storm drainage and any other service such as, but not limited to, a master television antenna system, cable television system, or security system which the Declarant or the Association might decide to have installed to serve the Community. It shall be expressly permissible for the Declarant, the Association, or the designee of either, as the case may be, to install, repair, replace, and maintain or to authorize the installation, repairing, replacing, and maintaining of such wires, conduits, cables and other equipment related to the providing of any such utility or service. Should any party furnishing any such utility or service request a specific license or easement by separate recordable document, the Board shall have the right to grant such easement.

Section 4.   **Easement for Entry**.   In addition to the right of the Board to exercise self-help as provided in Article XII, Section 2 hereof, the Board shall have the right, but shall not be obligated, to enter upon any property within the Community for emergency, security, and safety reasons, which right may be exercised by the manager, and all policemen, firemen, ambulance personnel, and similar emergency personnel in the performance of their respective duties. Except in an emergency situation, entry shall only be during reasonable hours and after notice to the Owner, and the entering party shall be responsible for any damage caused. This right of entry shall include the right of the Board to enter to cure any condition which may increase the possibility of a fire, slope erosion, or other hazard in the event an Owner or Occupant fails or refuses to cure the condition upon request by the Board.

Section 5. **Easement for Maintenance**. Declarant hereby expressly reserves a perpetual easement for the benefit of the Association across such portions of the Community, determined in the sole discretion of the Association, as are necessary to allow for the maintenance required under Article V.   Such maintenance shall be performed with a minimum of interference to the quiet enjoyment to Lots, reasonable steps shall be taken to protect such property, and damage shall be repaired by the Person causing the damage at its sole expense.

Section 6.   **Easement for Entry Features**.   There is hereby reserved to the Declarant and the Association an easement for ingress, egress, installation, construction, landscaping and maintenance of entry features and similar streetscapes for the Community over and upon each Lot within the Community on which entry features and similar streetscapes are located.   The easement and right herein reserved shall include the right to cut, remove and plant trees, shrubbery, flowers and other vegetation around such entry features and the right to grade the land under and around such entry features.

Section 7.   **Construction and Sale Period Easement**.   Notwithstanding any provisions contained in this Declaration, the Bylaws, Articles of Incorporation of the Association, use restrictions, rules and regulations, design guidelines, and any amendments thereto, until Declarant's right unilaterally to subject property to this Declaration as provided in Article IX terminates and thereafter

15

so long as Declarant owns any property in the Community for development and/or
sale, Declarant reserves an easement across all Community property for Declarant
and any builder or developer approved by Declarant to maintain and carry on, upon
such portion of the Community as Declarant may reasonably deem necessary, such
facilities and activities as in the sole opinion of Declarant may be required,
convenient, or incidental to Declarant's and such builder's or developer's
development, construction, and sales activities related to property described on
Exhibit "B" and Exhibit "C" to this Declaration, including, but without
limitation, (a) the right of access, ingress and egress for vehicular and
pedestrian traffic and construction activities over, under, on or in the
Community, including, without limitation, any Lot, (b) the right to tie into any
portion of the Community with driveways, parking areas and walkways, (c) the
right to tie into and/or otherwise connect and use (without a tap-on or any other
fee for so doing), replace, relocate, maintain and repair any device which
provides utility or similar services, including, without limitation, electrical,
telephone, natural gas, water, sewer and drainage lines and facilities
constructed or installed in, on, under and/or over the Community, (d) the right
to grant easements over, under, in or on the Community, including, without
limitation, the Lots, for the benefit of neighboring properties for the purpose
of tying into and/or otherwise connecting and using sewer and drainage lines and
facilities constructed or installed in, on, under and/or over the Community, (e)
the right, in the sole discretion of Declarant, to construct recreational
facilities on Common Property, (f) the right to carry on sales and promotional
activities in the Community, and (g) the right to construct and operate business
offices, signs, construction trailers, model residences, and sales offices.
Declarant and any such builder or developer may use residences, offices, or other
buildings owned or leased by Declarant or such builder or developer as model
residences and sales offices and may also use recreational facilities, if any,
available for use by the Community as a sales office or otherwise without charge.
Rights exercised pursuant to such reserved easement shall be exercised with a
minimum of interference to the quiet enjoyment of affected property, reasonable
steps shall be taken to protect such property, and damage shall be repaired by
the Person causing the damage at its sole expense.  This Section shall not be
amended without the Declarant's express written consent until the Declarant's
rights hereunder have terminated as hereinabove provided.

### Article XII
### General Provisions

Section 1.  **Enforcement**.  Each Owner and Occupant shall comply strictly
with the Bylaws, the rules and regulations, the use restrictions, as they may be
lawfully amended or modified from time to time, and with the covenants,
conditions, and restrictions set forth in this Declaration and in the deed to
such Owner's Lot, if any.  The Board of Directors may impose fines or other
sanctions, which shall be collected as provided herein for the collection of
assessments.  Failure to comply with this Declaration, the Bylaws or the rules
and regulations shall be grounds for an action to recover sums due for damages
or injunctive relief, or both, maintainable by the Board of Directors, on behalf
of the Association, or, in a proper case, by an aggrieved Owner.  Failure by the
Association or any Owner to enforce any of the foregoing shall in no event be
deemed a waiver of the right to do so thereafter.  The Board shall have the right
to record in the appropriate land records a notice of violation of the
Declaration, Bylaws, rules and regulations, use restrictions, or design
guidelines and to assess the cost of recording and removing such notice against
the Owner who is responsible (or whose Occupants are responsible) for violating
the foregoing.

Section 2.  **Self-Help**.  In addition to any other remedies provided for
herein, the Association or its duly authorized agent shall have the power to
enter upon any Lot or any other portion of the Community to abate or remove,
using such force as may be reasonably necessary, any structure, thing or

16

condition which violates this Declaration, the Bylaws, the rules and regulations, or the use restrictions. Unless an emergency situation exists, the Board shall give the violating Lot Owner ten (10) days' written notice of its intent to exercise self-help. Notwithstanding the foregoing, vehicles may be towed after reasonable notice. All costs of self-help, including, without limitation, reasonable attorney's fees actually incurred, shall be assessed against the violating Lot Owner and shall be collected as provided for herein for the collection of assessments.

Section 3. **Duration**. The covenants and restrictions of this Declaration shall run with and bind the Community, and shall inure to the benefit of and shall be enforceable by the Association or any Owner, their respective legal representatives, heirs, successors, and assigns, perpetually to the extent provided or allowed by law; provided, however, if the period during which covenants restricting land to certain uses may run is limited by applicable law, any provisions of this Declaration affected thereby shall run with and bind the land so long as permitted by such law, after which time any such provisions shall be (a) automatically extended for successive periods of ten (10) years, unless a written instrument reflecting disapproval signed by the then Owners of at least two-thirds (2/3) of the Lots and the Declarant (so long as the Declarant owns any property for development and/or sale in the Community or has the right unilaterally to annex additional property to the Community) has been recorded within the year immediately preceding the beginning of a ten (10) year renewal period agreeing to change such provisions, in whole or in part, or to terminate the same, in which case this Declaration shall be modified or terminated to the extent specified therein or (b) extended as otherwise provided by law. Every purchaser or grantee of any interest (including, without limitation, a security interest) in any real property subject to this Declaration, by acceptance of a deed or other conveyance therefor, thereby agrees that such provisions of this Declaration may be extended and renewed as provided in this Section.

Section 4. **Amendment**. This Declaration may be amended unilaterally at any time and from time to time by Declarant (a) if such amendment is necessary to bring any provision hereof into compliance with any applicable governmental statute, rule, or regulation or judicial determination which shall be in conflict therewith, (b) if such amendment is necessary to enable any reputable title insurance company to issue title insurance coverage with respect to the Lots subject to this Declaration, (c) if such amendment is required by an institutional or governmental lender or purchaser of mortgage loans, including, for example, the Federal National Mortgage Association or Federal Home Loan Mortgage Corporation, to enable such lender or purchaser to make or purchase Mortgage loans on the Lots subject to this Declaration, or (d) if such amendment is necessary to enable any governmental agency or reputable private insurance company to insure or guarantee Mortgage loans on the Lots subject to this Declaration; provided, however, any such amendment shall not adversely affect the title to any Owner's Lot unless any such Lot Owner shall consent thereto in writing. Further, so long as Declarant has the right unilaterally to subject additional property to this Declaration as provided in Article IX hereof, Declarant may unilaterally amend this Declaration for any other purpose; provided, however, any such amendment shall not materially adversely affect the substantive rights of any Lot Owner hereunder, nor shall it adversely affect title to any Lot without the consent of the affected Lot Owner.

In addition to the above, this Declaration may be amended upon the affirmative vote or written consent, or any combination thereof, of the Owners of at least two-thirds (2/3) of the Lots (other than Lots of Declarant so long as the consent of Declarant is required) and the consent of Declarant (so long as the Declarant owns any property for development and/or sale in the Community or has the right unilaterally to annex additional property to the Community). Amendments to this Declaration shall become effective upon recordation, unless a later effective date is specified therein. No provision of this Declaration which reserves or grants special rights to the Declarant shall be amended without

17

the Declarant's prior written approval so long as the Declarant owns any property for development and/or sale in the Community, or subject to annexation to the Community.

**Section 5. Gender and Grammar.** The singular, wherever used herein, shall be construed to mean the plural, when applicable, and the use of the masculine pronoun shall include the neuter and feminine.

**Section 6. Severability.** Whenever possible, each provision of this Declaration shall be interpreted in such manner as to be effective and valid, but if the application of any provision of this Declaration to any person or to any property shall be prohibited or held invalid, such prohibition or invalidity shall not affect any other provision or the application of any provision which can be given effect without the invalid provision or application, and, to this end, the provisions of this Declaration are declared to be severable.

**Section 7. Captions.** The captions of each Article and Section hereof, as to the contents of each Article and Section, are inserted only for convenience and are in no way to be construed as defining, limiting, extending, or otherwise modifying or adding to the particular Article or Section to which they refer.

**Section 8. Indemnification.** To the fullest extent allowed by applicable Georgia law, the Association shall indemnify every officer and director against any and all expenses, including, without limitation, attorney's fees, imposed upon or reasonably incurred by any officer or director in connection with any action, suit, or other proceeding (including settlement of any suit or proceeding, if approved by the then Board of Directors) to which such officer or director may be a party by reason of being or having been an officer or director. The officers and directors shall not be liable for any mistake of judgment, negligent or otherwise, except for their own individual willful misfeasance, malfeasance, misconduct, or bad faith. The officers and directors shall have no personal liability with respect to any contract or other commitment made by them, in good faith, on behalf of the Association (except to the extent that such officers or directors may also be members of the Association), and the Association shall indemnify and forever hold each such officer and director free and harmless against any and all liability to others on account of any such contract or commitment. Any right to indemnification provided for herein shall not be exclusive of any other rights to which any officer or director, or former officer or director, may be entitled. The Association shall maintain adequate general liability and officers' and directors' liability insurance to fund this obligation, if such coverage is reasonably available.

**Section 9. Books and Records.**

(a) _Inspection by Members and Mortgagees._ This Declaration, the Bylaws, copies of rules and use restrictions, membership register, books of account, and minutes of meetings of the members of the Board and of committees shall be made available for inspection and copying by any member of the Association or by the duly appointed representative of any member and by holders, insurers, or guarantors of any first Mortgage at any reasonable time and for a purpose reasonably related to such Person's interest as a member or holder, insurer, or guarantor of a first Mortgage at the office of the Association or at such other reasonable place as the Board shall prescribe.

(b) _Rules for Inspection._ The Board shall establish reasonable rules with respect to:

(i)   notice to be given to the custodian of the records;

(ii)  hours and days of the week when such an inspection may be made; and

(iii)  payment of the cost of reproducing copies of documents.

(c) <u>Inspection by Directors</u>. Every director shall have the absolute right at any reasonable time to inspect all books, records, and documents of the Association and the physical properties owned or controlled by the Association. The right of inspection by a director includes the right to make extra copies of documents at the reasonable expense of the Association.

**Section 10.** <u>Financial Review</u>. A review of the books and records of the Association shall be made annually in the manner as the Board of Directors may decide; provided, however, after having received the Board's financial statements at the annual meeting, by a majority of the Total Association Vote, the Owners may require that the accounts of the Association be audited as a common expense by a certified public accountant. Upon written request of any institutional holder of a first Mortgage and upon payment of all necessary costs, such holder shall be entitled to receive a copy of audited financial statements within ninety (90) days of the date of the request.

**Section 11.** <u>Notice of Sale or Lease</u>. In the event an Owner sells or leases such Owner's Lot, the Owner shall give to the Association, in writing, prior to the effective date of such sale or lease, the name of the purchaser or lessee of the Lot and such other information as the Board may reasonably require. Upon acquisition of a Lot, each new Owner shall give the Association, in writing, the name and mailing address of the Owner and such other information as the Board may reasonably request.

**Section 12.** <u>Agreements</u>. Subject to the prior approval of Declarant (so long as Declarant owns any property for development and/or sale in the Community or has the right unilaterally to annex additional property to the Community), all agreements and determinations, including settlement agreements regarding litigation involving the Association, lawfully authorized by the Board of Directors shall be binding upon all Owners, their heirs, legal representatives, successors, assigns, and others having an interest in the Community or the privilege of possession and enjoyment of any part of the Community.

**Section 13.** <u>Implied Rights</u>. The Association may exercise any right or privilege given to it expressly by this Declaration, the Bylaws, the Articles of Incorporation of the Association, any use restriction or rule, and every other right or privilege reasonably to be implied from the existence of any right or privilege given to it therein or reasonably necessary to effectuate any such right or privilege.

**Section 14.** <u>Variances</u>. Notwithstanding anything to the contrary contained herein, the Board of Directors or its designee shall be authorized to grant individual variances from any of the provisions of this Declaration, the Bylaws and any rule, regulation or use restriction promulgated pursuant thereto if it determines that waiver of application or enforcement of the provision in a particular case would not be inconsistent with the overall scheme of development for the Community.

**Section 15.** <u>Litigation</u>. No judicial or administrative proceeding shall be commenced or prosecuted by the Association unless approved by at least seventy-five percent (75%) of the Total Association Vote. This Section shall not apply, however, to (a) actions brought by the Association to enforce the provisions of this Declaration (including, without limitation, the foreclosure of liens), (b) the imposition and collection of assessments as provided in Article IV hereof, (c) proceedings involving challenges to <u>ad valorem</u> taxation, or (d) counterclaims brought by the Association in proceedings instituted against it. This Section shall not be amended unless such amendment is made by the Declarant pursuant to Article XII, Section 4 hereof, or is approved by the percentage votes, and pursuant to the same procedures, necessary to institute proceedings as provided above.

19

IN WITNESS WHEREOF, the undersigned, the Declarant herein, hereby executes this instrument by and through its duly authorized officers and under seal this 17th day of _OCTOBER_, 1994.

CHEATHAM LAKES AND ASSOCIATES, INC., a Georgia corporation

By: _____
Robert L. Roach, President

Attest: _____
Kevin R. Levent, Secretary/Treasurer

[Corporate Seal]

Signed, sealed, and delivered this 17 day of _OCTOBER_, 1994, in the presence of:

_____
WITNESS

_____
NOTARY PUBLIC

My Commission Expires: 6-1-97 _MY COMMISSION EXPIRES JUNE 1 19 97_
[Notarial Seal]

N. P. SEAL

CHRIS ... CHEROKEE COUNTY ... NOTARY PUBLIC

20

EXHIBIT "A"

## Definitions

The following words, when used in this Declaration or in any Supplementary Declaration (unless the context shall prohibit), shall have the following meanings:

(a)  "Association" shall mean Cheatham Lakes Homeowners Association Inc., a nonprofit Georgia corporation, its successors and assigns.

(b)  "Board of Directors" or "Board" of the Association shall be the appointed or elected body, as applicable, having its normal meaning under Georgia law.

(c)  "Bylaws" shall refer to the Bylaws of Cheatham Lakes Homeowners Association Inc., attached to this Declaration as Exhibit "D" and incorporated herein by this reference.

(d)  "Common Property" shall mean any and all real and personal property and easements and other interests therein, together with the facilities and improvements located thereon, now or hereafter owned by the Association for the common use and enjoyment of the Owners.

(e)  "Community" shall mean and refer to that certain real property and interests therein described in Exhibit "B", attached hereto, and (i) such additions thereto as may be made by Declarant by Supplementary Declaration of all or any portion of the real property described in Exhibit "C" attached hereto; and (ii) such additions thereto as may be made by the Association by Supplementary Declaration of other real property.

(f)  "Community-Wide Standard" shall mean the standard of conduct, maintenance, or other activity generally prevailing in the Community.  Such standard may be more specifically determined by the Board of Directors of the Association.  Such determination, however, must be consistent with the Community-Wide Standard originally established by the Declarant.

(g)  "Declarant" shall mean and refer to CHEATHAM LAKES AND ASSOCIATES, INC., a Georgia corporation, and its successors-in-title and assigns, provided any such successor-in-title or assign shall acquire for the purpose of development or sale all or any portion of the remaining undeveloped or unsold portions of the real property described in Exhibit "B", attached hereto, or in Exhibit "C", attached hereto, and provided further, in the instrument of conveyance to any such successor-in-title or assign, such successor-in-title or assign is designated as the "Declarant" hereunder by the grantor of such conveyance, which grantor shall be the "Declarant" hereunder at the time of such conveyance; provided, further, upon such designation of such successor Declarant, all rights of the former Declarant in and to such status as "Declarant" hereunder shall cease, it being understood that as to all of the property described in Exhibit "B", attached hereto, and in Exhibit "C", attached hereto, which is now or hereafter subjected to this Declaration, there shall be only one "Declarant" hereunder at any one point in time.

(h)  "Lot" shall mean any plot of land within the Community, whether or not improvements are constructed thereon, which constitutes or will constitute, after the construction of improvements, a single-family dwelling site as shown on a plat recorded in the land records of the county where the Community is located. The ownership of each Lot shall include, and there shall pass with each Lot as an appurtenance thereto, whether or not separately described, all of the right, title, and interest of an Owner in the Common Property, which shall include, without limitation, membership in the Association.

(i)  "Mortgage" means any mortgage, deed to secure debt, deed of trust, and any and all other similar instruments used for the purpose of encumbering real

property in the Community as security for the payment or satisfaction of an obligation.

(j)  "Mortgagee" shall mean the holder of a Mortgage.

(k)  "Occupant" shall mean any Person occupying all or any portion of a residence or other property located within the Community for any period of time, regardless of whether such Person is a tenant of the Owner of such property.

(l)  "Owner" shall mean and refer to the record owner, whether one or more Persons, of the fee simple title to any Lot located within the Community, excluding, however, any Person holding such interest merely as security for the performance or satisfaction of any obligation.

(m)  "Person" means any natural person, as well as a corporation, joint venture, partnership (general or limited), association, trust, or other legal entity.

(n)  "Supplementary Declaration" means an amendment or supplement to this Declaration which subjects additional property to this Declaration or imposes, expressly or by reference, additional restrictions and obligations on the land described therein, or both.

(o)  "Total Association Vote" means all of the votes attributable to members of the Association (including votes of Declarant), and the consent of Declarant so long as Declarant owns any property for development and/or sale in the Community or has the right to unilaterally annex additional property to the Community.

## LEGAL DESCRIPTION
## EXHIBIT "B"
## CHEATHAM LAKE PROPERTY

A 39.916 acre tract of land lying in and being a part of Land Lots 152 and 153 of the 20th District, 2nd Section, Cobb County, Georgia and being described as follows:

Commencing at an ½" R.B. at the intersection of Land Lots 152, 153, 613 and 612, along the Paulding and Cobb County Line, and being the point of beginning of tract described as follows:

Thence along Land Lot line of Land Lots 152 and 153, having a bearing of N 89°04'00" E, for a distance of 18.65 feet to a 3/4" OT; thence leaving said Land Lot line, along a bearing of N 00°37'56" W, for a distance of 1,160.61 feet to a Flat Iron @ Rock Pile; thence S 89°17'35" E, for a distance of 999.48 feet to a 1/2" CT; thence S 89°14'09" E, for a distance of 297.31 feet to a 3/4" OT; thence S 89°59'10" E, for a distance of 245.08 feet to a 1/2" RB; thence S 37°24'41" E, for a distance of 534.89 feet to a 1/2" RB on the northwesterly right-of-way line of Cheatham Ct. (60' R/W); thence along said right-of-way line, being a curve to the left, having a radius of 60.0 feet, an arc length of 74.36 feet, and a chord of S 16°58'52" W, for a distance of 69.69 feet to a point; thence continuing along said right-of-way line, S 24°43'09" W, for a distance of 127.11 feet to a 1/2" RB; thence leaving said right-of-way line, N 71°54'07" W, for a distance of 46.81 feet to a 1/2" RB; thence N 62°06'37" W, for a distance of 304.68 feet to a 1/2" RB; thence S 01°00'59" E, for a distance of 406.32 feet to a 1/2" RB; thence S 88°47'23" W, for a distance of 210.87 feet to a 1/2" RB; thence N 05°16'55" W, for a distance of 565.67 feet to a 1/2" RB; thence S85°59'44" W, for a distance of 848.08 feet to a point within a existing lake; thence S 26°15'45" E, for a distance of 667.44 feet to a 1/2" RB; thence S 39°07'12" E, for a distance of 124.73 feet to a 1/2" RB; thence N 82°00'22" E, for a distance of 166.53 feet to a 1/2" RB; thence S 47°17'53" E, for a distance of 683.14 feet to a 1/2" RB along the northwesterly right-of-way line of Cheatham Road (50' R/W); thence along said right-of-way line, S 63°05'08" W, for a distance of 295.00 feet to a 1/2" RB; thence leaving said right-of-way line, N 88°43'04" W, for a distance of 203.86 feet to a Concrete Monument with a Brass Disk; thence N 71°00'11" W, for a distance of 381.82 feet to a 1/2" Angle Iron; thence S 88°38'12" W, for a distance of 337.75 feet to a 1/2" RB; thence N 88°54'45" W, for a distance of 261.92 feet to a 1/2" RB on the Land Lot line of Land Lots 153 and 613; thence along said Land Lot line, also being the Paulding County and Cobb County line, N 00°27'33" E, for a distance of 355.31 feet to a 1/2" RB, and the Point of Beginning.

Said tract containing 39.916 acres, more or less, and subject to all easement, restrictions, and covenants of record.

BK8536PG0215

EXHIBIT "C"

Additional Property Which May Unilaterally
Be Submitted by Declarant

ALL THAT TRACT OR PARCEL OF LAND lying and being Land Lots   115, 151,
152, 153                                                    of the 20th District, 2nd Section,
of Cobb County, Georgia.

EXHIBIT "D"

BYLAWS

OF

CHEATHAM LAKES HOMEOWNERS ASSOCIATION, INC.

| Article | Section | | Page |
|---------|---------|-----|------|
|         | 7. | Treasurer | 7 |
|         | 8. | Resignation | 7 |
| V. | COMMITTEES | | 7 |
| VI. | MISCELLANEOUS | | 8 |
|     | 1. | Fiscal Year | 8 |
|     | 2. | Parliamentary Rules | 8 |
|     | 3. | Conflicts | 8 |
|     | 4. | Amendment | 8 |

BYLAWS

OF

CHEATHAM LAKES HOMEOWNERS ASSOCIATION, INC.

## Article I
### Name, Membership, Applicability, and Definitions

**Section 1.** **Name.** The name of the Association shall be Cheatham Lakes Homeowners Association, Inc. ("Association").

**Section 2.** **Membership.** The Association shall have one class of membership, as is more fully set forth in that Declaration of Protective Covenants for Cheatham Lakes (such Declaration, as amended, renewed, or extended from time to time, is hereinafter sometimes referred to as the "Declaration"), the terms of which pertaining to membership are specifically incorporated by reference herein.

**Section 3.** **Definitions.** The words used in these Bylaws shall have the same meaning as set forth in the Declaration, unless the context shall prohibit.

## Article II
### Association: Meetings, Quorum, Voting, Proxies

**Section 1.** **Place of Meetings.** Meetings of the Association shall be held at the principal office of the Association or at such other suitable place convenient to the members as may be designated by the Board of Directors, either in the Community or as convenient thereto as possible and practical.

**Section 2.** **First Meeting and Annual Meetings.** An annual or special meeting shall be held within one year from the date the Declaration is recorded. Annual meetings shall be set by the Board so as to occur no later than sixty (60) days after the close of the Association's fiscal year.

**Section 3.** **Special Meetings.** The President may call special meetings. In addition, it shall be the duty of the President to call a special meeting of the Association if so directed by resolution of the Board of Directors or upon a petition signed by at least twenty-five percent (25%) of the Total Association Vote (the consent of the Declarant shall not be required). The notice of any special meeting shall state the date, time, and place of such meeting and the purpose thereof. No business shall be transacted at a special meeting, except as stated in the notice.

**Section 4.** **Notice of Meetings.** It shall be the duty of the Secretary to mail or to cause to be delivered to the Owner of each Lot (as shown in the Association's records) a notice of each annual or special meeting of the Association stating the purpose of the special meeting, as well as the time and place where it is to be held, and in the notice of a special meeting, the purpose thereof. If an Owner wishes notice to be given at an address other than his or her Lot, such Owner shall designate by notice in writing to the Secretary such other address. The mailing or delivery of a notice of meeting in the manner provided in this Section shall be considered service of notice. Notices shall be served not less than ten (10) nor more than sixty (60) days before a meeting.

**Section 5.** **Waiver of Notice.** Waiver of notice of a meeting of the members shall be deemed the equivalent of proper notice. Any member may, in writing, waive notice of any meeting of the members, either before or after such meeting. Attendance at a meeting by a member, whether in person or by proxy, shall be deemed waiver by such member of notice of the time, date, and place thereof, unless such member specifically objects to lack of proper notice at the time the meeting is called to order.

| **Article** | **Section** | | **Page** |
|---|---|---|---|
| | 7. | Treasurer | 7 |
| | 8. | Resignation | 7 |
| V. | COMMITTEES | | 7 |
| VI. | MISCELLANEOUS | | 8 |
| | 1. | Fiscal Year | 8 |
| | 2. | Parliamentary Rules | 8 |
| | 3. | Conflicts | 8 |
| | 4. | Amendment | 8 |

**Section 6. Adjournment of Meetings.** If any meetings of the Association cannot be held because a quorum is not present, a majority of the members who are present at such meeting, either in person or by proxy, may adjourn the meeting to a time not less than five (5) nor more than thirty (30) days from the time the original meeting was called. At such adjourned meeting at which a quorum is present, any business which might have been transacted at the meeting originally called may be transacted without further notice.

**Section 7. Voting.** The voting rights of the members shall be as set forth in the Articles of Incorporation of the Association and the Declaration, and such voting rights are specifically incorporated herein.

**Section 8. Proxies.** At all meetings of members, each member may vote in person or by proxy. All proxies shall be in writing, dated, and filed with the Secretary before the appointed time of each meeting. Every proxy shall be revocable and shall automatically cease upon conveyance by the member of such member's Lot, or upon receipt of notice by the Secretary of the death or judicially declared incompetence of a member, or of written revocation, or upon the expiration of eleven (11) months from the date of the proxy.

**Section 9. Quorum.** The presence, in person or by proxy, of twenty five percent (25%) of the total eligible Association vote shall constitute a quorum at all meetings of the Association. The members present at a duly called or held meeting at which a quorum is present may continue to do business until adjournment, notwithstanding the withdrawal of enough members to leave less than a quorum.

**Section 10. Action Without a Formal Meeting.** Any action to be taken at a meeting of the members or any action that may be taken at a meeting of the members may be taken without a meeting if one or more consents, in writing, setting forth the action so taken, shall be signed by members holding the voting power required to pass such action at a meeting held on the date that the last consent is executed and such action is consented to by the Declarant if required. Such action shall be effective upon receipt by the Association of a sufficient number of such consents executed by current members unless a later effective date is specified therein. Each signed consent shall be delivered to the Association and shall be included in the minutes of meetings of members filed in the permanent records of the Association.

**Section 11. Action by Written Ballot.** Any action to be taken at any annual, regular or special meeting of members may be taken without a meeting if approved by written ballot as provided herein. The Association shall deliver a written ballot to each member entitled to vote on the matter. The written ballot shall set forth each proposed action and provide an opportunity to vote for or against each proposed action. Approval by written ballot of an action shall only be valid when the number of votes cast by ballot equals or exceeds the quorum required to be present at a meeting held to authorize such action and the number of approvals equals or exceeds the number of votes that would be required to approve the matter at a meeting at which the total number of votes cast was the same as the number of votes cast by ballot. All solicitations for votes by written ballot shall indicate the number of responses needed to meet the quorum requirements; state the percentage of approvals necessary to approve such matter other than the election of directors; and specify the time by which a ballot must be received by the Association in order to be counted. A timely written ballot received by the Association may not be revoked without the consent of the Board of Directors. The results of each action by written ballot shall be certified by the Secretary and shall be included in the minutes of meetings of members filed in the permanent records of the Association.

2

## Article III
## Board of Directors:  Number, Powers, Meetings

**A.  Composition and Selection.**

    **Section 1.  Governing Body: Composition.**  The affairs of the Association shall be governed by a Board of Directors.  Except as provided in Section 2 of this Article, the directors must reside in the Community and shall be members or spouses of such members; provided, however, no person and his or her spouse may serve on the Board at the same time.

    **Section 2.  Directors Appointed by Declarant.**  Declarant shall have the right to appoint or remove any member or members of the Board of Directors or any officer or officers of the Association until such time as the first of the following events shall occur:  (a) the expiration of five (5) years after the date of the recording of the Declaration, (b) the date on which forty-four (44) Lots shall have been conveyed to Persons who have not purchased such Lots for the purpose of construction of a residence and resale of such Lot and residence, or (c) the surrender by Declarant in writing of the authority to appoint and remove directors and officers of the Association.  Each Owner, by acceptance of a deed to or other conveyance of a Lot, vests in Declarant such authority to appoint and remove directors and officers of the Association.  The directors selected by the Declarant need not be Owners or residents in the Community.

    **Section 3.  Number of Directors.**  The Board shall consist of three (3) members.

    **Section 4.  Nomination of Directors.**  Elected directors shall be nominated from the floor and may also be nominated by a nominating committee, if such a committee is established by the Board.  All candidates shall have a reasonable opportunity to communicate their qualifications to the members and to solicit votes.

    **Section 5.  Election and Term of Office.**  Owner-elected directors shall be elected and hold office as follows:

    (a)   After the Declarant's right to appoint directors and officers terminates, the Association shall call a special meeting to be held at which Owners shall elect three (3) directors.

    (b)   At annual meetings of the membership thereafter, directors shall be elected.  All eligible members of the Association shall vote on all directors to be elected, and the candidate(s) receiving the most votes shall be elected.

    The term of one director shall be fixed at one year, the term of one director shall be fixed at two years, and the term of one director shall be fixed at three years.  At the expiration of the initial term of office of each respective Owner-elected member of the Board of Directors, a successor shall be elected to serve for a term of two years.  The members of the Board of Directors shall hold office until their respective successors shall have been elected by the Association.

    **Section 6.  Removal of Directors.**  At any regular or special meeting of the Association duly called, any one or more of the members of the Board of Directors may be removed, with or without cause, by a majority of the Total Association Vote and a successor may then and there be elected to fill the vacancy thus created.  A director whose removal has been proposed by the Owners shall be given at least ten (10) days' notice of the calling of the meeting and the purpose thereof and shall be given an opportunity to be heard at the meeting.  Additionally, any director who has three (3) consecutive unexcused absences from Board meetings or who is delinquent in the payment of an assessment for more than thirty (30) days may be removed by a majority vote of the directors at a meeting,

3

a quorum being present. This Section shall not apply to directors appointed by Declarant.

Section 7. **Vacancies**. Vacancies in the Board of Directors caused by any reason, excluding the removal of a director by vote of the Association, shall be filled by a vote of the majority of the remaining directors, even though less than a quorum, at any meeting of the Board of Directors. Each person so selected shall serve the unexpired portion of the term.

B. **Meetings**.

Section 8. **Organization Meetings**. The first meeting of the Board of Directors following each annual meeting of the membership shall be held within ten (10) days thereafter at such time and place as shall be fixed by the Board.

Section 9. **Regular Meetings**. Regular meetings of the Board of Directors may be held at such time and place as shall be determined from time to time by a majority of the directors, but at least four (4) such meetings shall be held during each fiscal year with at least one per quarter. Notice of the regular schedule shall constitute sufficient notice of such meetings.

Section 10. **Special Meetings**. Special meetings of the Board of Directors shall be held when requested by the President, Vice President or by any two directors. The notice shall specify the time and place of the meeting and the nature of any special business to be considered. The notice shall be given to each director by one of the following methods: (a) by personal delivery; (b) written notice by first class mail, postage prepaid; (c) by telephone communication, either directly to the director or to a person at the director's home or office who would reasonably be expected to communicate such notice promptly to the director; (d) by telegram, charges prepaid; or (e) by commercial delivery service to such director's home or office. All such notices shall be given or sent to the director's address or telephone number as shown on the records of the Association. Notices sent by first class mail shall be deposited into a United States mailbox at least four (4) days before the time set for the meeting. Notices given by personal delivery, telephone, or telegraph company shall be given at least forty-eight (48) hours before the time set for the meeting.

Section 11. **Waiver of Notice**. The transactions of any meeting of the Board of Directors, however called and noticed or wherever held, shall be as valid as though taken at a meeting duly held after regular call and notice, if (a) a quorum is present, and (b) either before or after the meeting, each of the directors not present signs a written waiver of notice, a consent to holding the meeting, or an approval of the minutes. The waiver of notice or consent need not specify the purpose of the meeting. Notice of a meeting shall also be deemed given to any director who attends the meeting without protesting before or at its commencement about the lack of adequate notice.

Section 12. **Quorum of Board of Directors**. At all meetings of the Board of Directors, a majority of the directors shall constitute a quorum for the transaction of business, and the votes of a majority of the directors present at a meeting at which a quorum is present shall constitute the decision of the Board of Directors.

Section 13. **Compensation**. No director shall receive any compensation from the Association for acting as such. However, any director may be reimbursed for his or her actual expenses incurred in the performance of his or her duties.

Section 14. **Open Meetings**. All meetings of the Board shall be open to all members, but members other than directors may not participate in any discussion or deliberation unless expressly so authorized by the Board.

4

**Section 15.** **Executive Session.** The Board may adjourn a meeting and reconvene in executive session to discuss and vote upon personnel matters, litigation in which the Association is or may become involved, and orders of business of a similar nature. The nature of any and all business to be considered in executive session shall first be announced in open session.

**Section 16.** **Action Without A Formal Meeting.** Any action to be taken at a meeting of the directors or any action that may be taken at a meeting of the directors may be taken without a meeting if one or more consents, in writing, setting forth the action so taken, shall be signed by a majority of the directors and delivered to the Association for inclusion in the minutes for filing in the corporate records.

**Section 17.** **Telephonic Participation.** One or more directors may participate in and vote during any regular or special meeting of the Board by telephone conference call or similar communication equipment by means of which all persons participating in the meeting can hear each other at the same time, and those directors so participating shall be present at such meeting. Any such meeting at which a quorum participates shall constitute a regular meeting of the Board.

## C. Powers and Duties.

**Section 18.** **Powers.** The Board of Directors shall be responsible for the affairs of the Association and shall have all of the powers and duties necessary for the administration of the Association's affairs and, as provided by law, may do all acts and things as are not by the Declaration, Articles of Incorporation of the Association, or these Bylaws directed to be done and exercised exclusively by the members. In addition to the duties imposed by these Bylaws or by any resolution of the Association that may hereafter be adopted, the Board of Directors shall have the power to and be responsible for the following, in way of explanation, but not limitation:

(a) preparation and adoption of an annual budget in which there shall be established the contribution of each Owner to the common expenses;

(b) making assessments to defray the common expenses, establishing the means and methods of collecting such assessments, and establishing the period of the installment payments of the annual assessment;

(c) providing for the operation, care, upkeep, and maintenance of all areas which are the maintenance responsibility of the Association;

(d) designating, hiring, and dismissing the personnel necessary for the operation of the Association and, where appropriate, providing for the compensation of such personnel and for the purchase of equipment, supplies, and material to be used by such personnel in the performance of their duties;

(e) collecting the assessments, depositing the proceeds thereof in a bank depository which it shall approve, and using the proceeds to administer the Association;

(f) making and amending use restrictions and rules and regulations;

(g) opening of bank accounts on behalf of the Association and designating the signatories required;

(h) enforcing by legal means the provisions of the Declaration, these Bylaws, and the rules and regulations adopted by it, and bring any proceedings which may be instituted on behalf of or against the Owners concerning the Association;

5

(i)  obtaining and carrying insurance against casualties and liabilities, as provided in the Declaration, and paying the premium cost thereof;

(j)  paying the cost of all services rendered to the Association or its members which are not directly chargeable to Owners;

(k)  keeping books with detailed accounts of the receipts and expenditures affecting the Association and its administration, and specifying the maintenance and repair expenses and any other expenses incurred; and

(l)  contracting with any Person for the performance of various duties and functions.

**Section 19.  Management Agent.**  The Board of Directors may employ for the Association a professional management agent or agents at a compensation established by the Board of Directors to perform such duties and services as the Board of Directors shall authorize.  The Declarant or an affiliate of the Declarant may be employed as managing agent or manager.  The term of any management agreement shall not exceed one year and shall be subject to termination by either party, without cause and without penalty, upon thirty (30) days' written notice.

**Section 20.  Borrowing.**  The Board of Directors shall have the power to borrow money for the purpose of repair or restoration of the Common Property and facilities without the approval of the members of the Association; provided, however, the Board shall obtain membership approval in the same manner as for special assessments, in the event that the proposed borrowing is for the purpose of modifying, improving, or adding amenities, and the total amount of such borrowing exceeds or would exceed Four Thousand Dollars ($4,000.00) outstanding debt at any one time.

**Section 21.  Fining Procedure.**  The Board shall not impose a fine (a late charge shall not constitute a fine) unless and until the following procedure is followed:

(a)  **Notice.**  Written notice shall be served upon the violator by first-class or certified mail sent to the last address of the member shown on the Association's records, specifying:

(i)  the nature of the violation, the fine to be imposed and the date, not less than fifteen (15) days from the date of the notice, that the fine will take effect;

(ii)  that the violator may, within ten (10) days from the date of the notice, request a hearing regarding the fine imposed;

(iii)  the name, address and telephone numbers of a person to contact to challenge the fine;

(iv)  that any statements, evidence, and witnesses may be produced by the violator at the hearing; and

(v)  that all rights to have the fine reconsidered are waived if a hearing is not requested within ten (10) days of the date of the notice.

(b)  **Hearing.**  If a hearing is requested, it shall be held before the Board in executive session, and the violator shall be given a reasonable opportunity to be heard.  The minutes of the meeting shall contain a written statement of the results of the hearing.  No fine shall be imposed prior to the date that is five (5) days after the date of the hearing.

6

## Article IV
## Officers

**Section 1.   Officers.**   The officers of the Association shall be a President, Vice President, Secretary, and Treasurer. Any two or more offices may be held by the same person, except the offices of President and Secretary. The President and Treasurer shall be elected from among the members of the Board of Directors.

**Section 2.   Election, Term of Office, and Vacancies.**   Except during the period in which the Declarant has the right to appoint the officers of the Association under Article III, Section 2 of these Bylaws, the officers of the Association shall be elected annually by the Board of Directors at the first meeting of the Board of Directors following each annual meeting of the members. A vacancy in any office arising because of death, resignation, removal, or otherwise may be filled by the Board of Directors for the unexpired portion of the term.

**Section 3.   Removal.**   Any officer may be removed by the Board of Directors whenever, in its judgment, the best interests of the Association will be served thereby.

**Section 4.   President.**   The President shall be the chief executive officer of the Association and shall preside at all meetings of the Association and of the Board of Directors.   The President shall have all the general powers and duties which are incident to the office of the president of a corporation organized under the Georgia Nonprofit Corporation Code.

**Section 5.   Vice President.**   The Vice President shall act in the President's absence and shall have all powers, duties, and responsibilities provided for the President when so acting.

**Section 6.   Secretary.**   The Secretary shall keep the minutes of all meetings of the Association and of the Board of Directors and shall have charge of such books and papers as the Board of Directors may direct and shall, in general, perform all duties incident to the office of the secretary of a corporation organized in accordance with Georgia law.

**Section 7.   Treasurer.**   The Treasurer shall have the responsibility for the Association's funds and securities and shall be responsible for keeping full and accurate financial records and books of account showing all receipts and disbursements, for preparing all required financial statements and tax returns, and for the deposit of all monies and other valuable effects in the name of the Association or the managing agent in such depositories as may from time to time be designated by the Board of Directors.

**Section 8.   Resignation.**   Any officer may resign at any time by giving written notice to the Board of Directors.  Such resignation shall take effect on the date of the receipt of such notice or at any later time specified therein, and unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective.

## Article V
## Committees

Committees to perform such tasks and to serve for such periods as may be designated by the Board are hereby authorized. Each committee shall be composed and shall operate in accordance with the terms of the resolution of the Board of Directors designating the committee or with rules adopted by the Board of Directors.

7

## Article VI
## Miscellaneous

**Section 1.   Fiscal Year.**   The fiscal year of the Association shall be determined by resolution of the Board.  In the absence of such a resolution, the fiscal year shall be the calendar year.

**Section 2.   Parliamentary Rules.**   Roberts Rules of Order (current edition) shall govern the conduct of all Association proceedings, when not in conflict with Georgia law, the Articles of Incorporation of the Association, the Declaration, these Bylaws, or a ruling made by the person presiding over the proceeding.

**Section 3.   Conflicts.**   If there are conflicts or inconsistencies between the provisions of Georgia law, the Articles of Incorporation of the Association, the Declaration, and these Bylaws, the provisions of Georgia law, the Declaration, the Articles of Incorporation of the Association, and the Bylaws (in that order) shall prevail.

**Section 4.   Amendment.**   These Bylaws may be amended by the Board of Directors (a) if such amendment is necessary to bring any provision hereof into compliance with any applicable governmental statute, rule, or regulation or judicial determination which shall be in conflict therewith, (b) if such amendment is necessary to enable any title insurance company to issue title insurance coverage with respect to the Lots subject to the Declaration, (c) if such amendment is required by an institutional or governmental lender or purchaser of mortgage loans, including, for example, the Federal National Mortgage Association or Federal Home Loan Mortgage Corporation, to enable such lender or purchaser to make or purchase mortgage loans on the Lots subject to the Declaration, or (d) if such amendment is necessary to enable any governmental agency or insurance company to insure or guarantee mortgage loans on the Lots subject to the Declaration.  In addition, these Bylaws may be amended upon the affirmative vote or written consent, or any combination thereof, of at least two-thirds (2/3) of the Total Association Vote; provided, however, that the U.S. Department of Veterans Affairs ("VA") (if it is then guaranteeing any mortgage in the Community or has issued a project approval for the guaranteeing of such mortgages) and/or the U.S. Department of Housing and Urban Development ("HUD") (if it is then insuring any mortgage in the Community or has issued a project approval for the insuring of such mortgages) shall have the right to veto material amendments to these Bylaws for as long as the Declarant has the right to appoint and remove the directors and officers of the Association.

8

BK8536PG0227

## <u>LOCAL RULE 5.1 CERTIFICATION</u>

Counsel certifies that the foregoing document was prepared with accordance with the type and font selections approved by Local Rule 5.1. in Times Roman 14 Point Font.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

PAUL SHIMEK, III, KATHY
FORBES, GEORGE FORBES,
MILDRED BOBBITT, and
JOHN ROSA,

       **Plaintiffs,**

**v.**

WEISSMAN, NOWACK, CURRY
& WILCO, P.C.,

       **Defendant.**

**CIVIL ACTION
FILE NO. 1:02 CV 3020 WBH**

## CERTIFICATE OF SERVICE

This will certify that I have this day served opposing counsel in the above-referenced matter with the foregoing DEFENDANT WEISSMAN, NOWACK, CURRY & WILCO, P.C.'S COUNTER-STATEMENT OF MATERIALS FACTS NOT IN DISPUTE AND RESPONSE TO PLAINTIFFS' STATEMENT OF MATERIALS FACTS NOT IN DISPUTE, by placing a copy of same in the United States Mail with proper postage affixed thereon and addressed to:

> Robert Kaiden, Esq.
> Cristina Kaiden, Esq.
> 1850 Lake Park Drive
> Suite 204
> Smyrna, Georgia 30080

12

This 10th day of February, 2003.

_____
Edward M. Gilgor

Weissman, Nowack, Curry & Wilco, P.C.
One Alliance Center
4th Floor, 3500 Lenox Road
Atlanta, Georgia 30326
(404) 926-4500
(404) 926-4600 (Fax)

13